Ossie DAVIS, Napoleon Holmes, Wilhelmina Strong, and Paul D. Dennis, Plaintiffs,

v.

CITY OF NEW ROCHELLE, N.Y., City Council of the City of New Rochelle, N.Y. and Westchester County Board of Elections, Defendants.

No. 91 Civ. 1736 (RWS).

United States District Court, S.D. New York.

July 18, 1994.

Randolph M. Scott–McLaughlin, Center for Constitutional Rights, New York City, for plaintiffs.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Vincent R. Fontana, Molly Klapper, of counsel), for defendant City of New Rochelle.

Marilyn J. Slaatten, Westchester Co. Atty., White Plains, NY (Barbara F. Kukowski, Asst. Co. Atty., of counsel), for defendant Westchester County Bd. of Elections.

## OPINION

SWEET, District Judge.

Plaintiffs Ossie Davis, Napoleon Holmes, Wilhelmina Strong, and Paul Dennis (collectively, the "Plaintiffs"), on behalf of themselves and all those similarly situated, have moved for an award of attorney fees pursuant to 42 U.S.C. § 1973*l*(e) of the Voting Rights Act of 1965 which is opposed by Defendants City of New Rochelle, New York (the "City" or "New Rochelle"), the City Council of the City of New Rochelle (the "City Council"), New York, and the Westchester County Board of Elections (the "County Board") (collectively, the "Defendants").

For the reasons set forth below, the Plaintiffs' application is granted.

### The Parties

The Plaintiffs are black adult citizens and residents of the City and Westchester County and bring this class action suit on behalf of all black citizens and residents of New Rochelle.

The City, a municipal corporation located in Westchester County, is organized and exists under the State of New York.

The Council is an elected body of five members which exercises, except as otherwise provided in the City Charter, all powers conferred upon the City.

The County Board of Elections is a board or agency of New York State which is responsible for conducting elections for the City Council.

### The Facts and Prior Proceedings

The Complaint in this voting rights action was filed on March 13, 1991, and was formally certified as a class action on July 30, 1991, pursuant to Rule 23(b)(2), Fed.R.Civ.P., no opposition having been filed. Discovery and pretrial conferences ensued. The Plaintiffs challenged the at-large election of the City Council pursuant to the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*, on the grounds that only one minority ever had been elected to City Council, and none at all in the past two decades, notwithstanding the fact that 18% of New Rochelle's population is African American.

The first New Rochelle Charter Revision Commission (the "First Commission") was formed on August 31, 1990, by then Mayor Leonard Paduano who "conceived the charter revision as a chance to put the 'strong mayor' form of government before the voters." (Defs.' Ex. C, Michael Amodio, *New Rochelle to Take A Look at Itself,* Gannett Westchester Newspapers, September 2, 1990 at A3; Walton Aff. ¶ 5.) [1]

The "strong mayor" question dominated the publicity concerning the First Commis-

sion's work until March of 1991 when this action was commenced. The news clippings proffered by both parties indicate that this lawsuit triggered a significant amount of publicity concerning the redistricting question. (*See* Pls.' Ex. F; Defs.' Ex. C.) According to Commission Member Calvin Walton ("Walton"), the filing of this lawsuit on March 13, 1991, "forced the question of districts versus at-large elections onto the front burner." (Walton Aff. ¶ 7.)

In the months subsequent to the filing of the *Davis* action, the First Commission contacted the Plaintiffs' lead counsel for his opinion concerning the ramifications of the lawsuit, (*see* Commission Member Trotta's Mem. to the Commission, Apr. 15, 1991; Pls.' Ex. F) and the effective dates of the proposed referenda. (*See* Scott–McLaughlin Decl. ¶ 13.)

On November 5, 1991, New Rochelle voters cast the majority of their ballots in favor of the re-districting formula put forward by the First Commission, but rejected the "strong Mayor" referendum. As the two referenda were linked, both failed. Subsequent to the November 1991 elections, settlement negotiations for this lawsuit were initiated but eventually lapsed.

On February 26, 1992, the City Council formed the Second Charter Revision Commission (the "Second Commission") in order to draft a re-districting plan. On April 1, 1992, the Plaintiffs agreed to stay this action for nine months pursuant to the Defendants' representations that such a period would allow the Second Commission sufficient time to propose a new plan. (Fontana letter, March 10, 1992; Pls.' Ex. H.)

In August 1992 a local newspaper reported that the Co–Chairman of the Second Commission, James Bishop, had asserted that the new re-districting plan would not come before the voters until the next regular election in November 1993 since "holding a special

---

1. A review of Defendants' newspaper clippings, (*see* Defs. Ex. C), indicates that from the time of the First Commission's appointment at the end of August 1990, through the end of February 1991, the gravamen of its efforts was directed towards changing the City Manager–Council system to a "strong mayor" form of city government. The

first mention within the text of these clippings that the First Commission was concerned at all with re-districting does not appear until late February of 1991. (*See, e.g.,* Pati Nash, *Panel Members Say its Time to Review Charter,* Gannett Westchester Newspapers, February 22, 1991, at A5.)

election before then, such as in the spring, would be expensive and attract few voters." (Tim Donahue, *New Rochelle May be Sued for Discrimination,* The Standard Star, August 17, 1992, at 5A.)

At a public hearing the Plaintiffs' counsel responded to the Second Commission's proposed delay by threatening to press this action in an expedited fashion. In light of this threat, the editorial board of The Standard Star urged the expedited adoption of the re-districting:

> [T]he charter commission has indicated a new vote might not come until November 1993. It will take that long, its co-chairman says, to study the issue and chart new districts.
>
> Why wait for that? Why not put up the same resolution that was already approved? Why go through the time and expense of preparing new districts before voters give their go-ahead for their creation?

Those are Scott–McLaughlin's questions. And ours.

And here's another. Why invite Scott–McLaughlin to press for a trial date—which he proposes to do—when voters have once agreed to what he is seeking. Defending the suit would cost money. The trial could engender ill will among community groups something New Rochelle doesn't need. And, given the record of success of such voting-rights suits in federal courts, the city will probably lose.

The Standard Star, August 20, 1992.

On December 29, 1992, the Second Commission voted to hold a special election concerning the question of re-districting on March 2, 1993—a full eight months prior to the original proposed date. The referendum passed and on March 4, 1993, the City invited interested parties—including the Plaintiffs—to submit re-districting proposals. (Mayor Idoni letter, March 4, 1994.) On March 24, 1993, the Plaintiffs submitted a proposed re-districting plan which included one minority district and one minority-influence district. On April 29, 1993, the City Council adopted a district plan which, although not identical to the Plaintiffs' proposed re-districting plan, included one minority district and one minority-influence district.

On May 25, 1993, Plaintiffs' counsel advised this Court that the main issues in this action had been resolved, but for the question of fees, the Defendants having refused to discuss this issue.[2]

Plaintiffs now seek the following attorneys fees and costs:

| Name | Hours | Rate | Lodestar |
|---|---|---|---|
| Scott–McLaughlin | 223.75 | $300.00 | $67,125.00 |
| Cherner | | | |
| as Law Student | 63.50 | $75.00 | $4,762.00 |
| as Attorney | 133.25 | $110.00 | $14,687.50 |
| Morioka (Law Stud.) | 13.00 | $75.00 | $975.00 |
| Costs | | | 0.00 |
| GRAND TOTAL | 433.50 | | $88,649.50 |

(See Pls. Exs. N–P.)

---

Defendants oppose this fee application on the following grounds: (1) Plaintiffs are not prevailing parties within the meaning of the Voting Rights Act and § 1988; (2) excessive hourly rate for lead counsel and law students; (3) inappropriate request for compensation of travel time; (4) lack of specificity in hours billed; (5) duplicative and excessive entries; (6) billed activities unrelated to the advancement of the litigation; and (7) appli-

**2.** "I have been advised that the City is not prepared to accept your demand nor are they prepared to offer a compromise amount. Therefore, I suggest that you file a formal motion for attor-neys' fees to which we will promptly respond." (Fontana letter of December 29, 1993; Pls.' Ex. R.)

cation of attorneys' fees is non-compensable. According to the Defendants, if granted at all, the fees awarded to Plaintiffs' counsel should be substantially reduced.

Although oral argument was heard on May 19, 1994, supplemental letter briefs were received by the Court through May 24, 1994, and the application was considered fully submitted as of that date.

### Discussion

Two issues are before this Court: first, whether the Plaintiffs may be considered prevailing parties; and if so, second, whether their application is reasonable, in light of the limited litigation effort. Both issues are considered pursuant to the Supreme Court's admonishment that "[a] request for attorneys' fees should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

■ On a fee application, the claimant has the initial burden of documenting and proving its claims. *Id.* Although a fee application hearing is a possibility, to the extent that the Plaintiffs have met their burden in the moving papers, their fee application is granted in part, as set forth below.

### I. *Plaintiffs Are Prevailing Parties* [3]

Claims under the Voting Rights Act of 1965 have been traditionally prosecuted by

**3.** Under the American Rule, a prevailing party generally is not permitted to collect fees from the loser. However, there are several exceptions to this rule: (1) under Congressionally mandated fee-shifting statutes, such as 42 U.S.C. § 19731(e) here, courts may award "reasonable fees" to the prevailing party; (2) courts may assess fees in order to secure a party's compliance with the wilful violation of a court order; (3) courts may assess fees against parties who have acted in bad faith or vexatiously; and (4) courts may assess fees in "common fund" cases which allow litigants to recover fees in securities or anti-trust cases. *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air,* 478 U.S. 546, 561–62, 562 n. 6, 106 S.Ct. 3088, 3096–97, 3096 n. 6, 92 L.Ed.2d 439 (1986).

**4.** The academic literature has commented upon this policy in the voting rights context. *See* Laughlin McDonald, *Minority Voting Rights,* 42 Vand.L.Rev. 1249, 1291–92 (1989):

The Department [of Justice] has been most neglectful in enforcing the Voting Rights Act in the area of affirmative litigation, where it must

the private, and more specifically the civil rights, bar.[4] As the Second Circuit has noted, "[s]hifting attorneys' fees enabled Congress to promote vigorous enforcement of its civil rights policies, while limiting the growth of the bureaucracy charged with its administration.... Congress was aware that victims of civil rights violations usually are not wealthy people and '[t]he organizations who have helped them bring their cases are frequently not well financed.'" *Wilder v. Bernstein,* 965 F.2d 1196, 1203 (2d Cir.) (Cardamone, J.) (citations and emphasis omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 410, 121 L.Ed.2d 335 (1992).

The Voting Rights Act attorney's fee provision states:

In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1973*l*(e). Since § 1973*l*(e) and § 1988[5] contain nearly identical language and are driven by similar Congressional intent, the Courts construe these fee shifting statutes similarly. *See, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983); *Hastert v.*

exercise initiative in instituting challenges to discriminatory practice. Between 1978 and 1988, a total of 2236 voting rights lawsuits were filed in the federal district courts.... Private parties brought the rest of the 2052 cases (95.1 percent). As is apparent, the civil rights community, frequently opposed by the Department of Justice on such critical issues as extension and amendment of the Act and the construction of the results standard, has borne the burden of modern voting rights enforcement.

**5.** The Civil Rights Attorney's Fees Award Act of 1976, or what is more commonly known as § 1988, provides in relevant part:

In any action or proceeding to enforce a provision of sections 1981, 1983, 1985, and 1986 of this title, title IX, of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. 42 U.S.C. § 1988.

*Illinois State Bd. of Election Comm'rs,* 28 F.3d 1430, 1439 n. 10 (7th Cir.1994); *Metropolitan Pittsburgh Crusade for Voters v. Pittsburgh,* 964 F.2d 244, 249–50 (3d Cir. 1992); *Leroy v. City of Houston,* 831 F.2d 576, 579 n. 4 (5th Cir.1987), *cert. denied,* 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988).

Originally, § 1988 was designed to curb the broad ranging impact of the Supreme Court's "private attorney general" doctrine as set forth in *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Section 1988 was designed to restrict fee awards in such private attorney general actions to those parties who had "prevailed" at the trial court level. Congressman Drinan, the Fee Act's sponsor in the House of Representatives, stated that under the Act a plaintiff could be awarded fees even in a situation in which a final judgment on the merits was not achieved, as is the case with consent decrees, settlements, or where a defendant, upon the plaintiffs filing of a suit, discontinued the illegal practice. *See* H.R.Rep. No. 1558, at 6–8 (report of Rep. Drinan).

However, in the last decade, the Supreme Court has limited such an expansive interpretation of what is a "prevailing" party through a progression of four decisions. *See* Daniel L. Lowery, Note, *"Prevailing Party" Status for Civil Rights Plaintiffs: Fee-Shifting's Shifting Threshold,* 61 U.Cin.L.Rev. 1441, 1447–55 (1993) (discussing the Court's decisions in *Hewitt v. Helms,* 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), *Rhodes v. Stewart,* 488 U.S. 1, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988), *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), *Farrar v. Hobby,* — U.S. —, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)).

The Court's recent fees jurisprudence has identified "[t]he touchstone of the prevailing party inquiry [to] be the material alteration of the legal relationship of the parties...." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989). Thus, "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of the claim" either through a "judgment," a "consent decree" or a "settlement." *Farrar v. Hobby,* 501 U.S. —, —, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992) (citing *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 2675, 96 L.Ed.2d 654 (1987) and *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, ·2575, 65 L.Ed.2d 653 (1980)).

■ Nonetheless, a formal written statement of judgment, however, remains unnecessary, *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574–75, 65 L.Ed.2d 653 (1980), as "it is plain that a party may prevail when it vindicates rights—regardless of whether there is a formal judgment—through a settlement or consent judgment." *Wilder v. Bernstein,* 965 F.2d 1196, 1202 (2d Cir.) (holding intervenors may be considered prevailing parties), *cert. denied,* — U.S. —, 113 S.Ct. 410, 121 L.Ed.2d 335 (1992).

Indeed, some courts have speculated that the mere showing that a defendant has altered his or her behavior as a result of the plaintiff's lawsuit is adequate to confer prevailing party status.

A lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment—e.g., a monetary settlement or a change in conduct that redresses the plaintiffs' grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.

*Lyte v. Sara Lee Corp.,* 950 F.2d 101, 104 (2d Cir.1991) (quoting *Koster v. Perales,* 903 F.2d 131, 134 (2d Cir.1990), quoting *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987)). But, cautions a unanimous Supreme Court, such a change must be more than "de minimis" or "technical." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989) (holding a "prevailing party" under § 1988 need only succeed on "any significant issue" that achieves some of the benefit sought by the lawsuit).

It is manifest that unlawful defendants should not be permitted to circumvent fee

shifting liability by simply avoiding formal settlement. Towards this end, the Second Circuit's has long embraced the theory that a "prevailing party must show a causal connection between the relief obtained and the litigation in which fees are sought," *Gerena–Valentin v. Koch,* 739 F.2d 755, 758 (2d Cir. 1984), or what is more commonly known as the "catalyst" doctrine.[6] This doctrine permits an award of attorney's fees so long as the "plaintiff's lawsuit was 'a catalytic, necessary, or substantial factor in attaining the relief.'" *See* 739 F.2d at 758–59 (adopting the "catalyst" standard as set forth in *Commissioners Court of Medina County, Texas v. United States,* 683 F.2d 435, 440 (D.C.Cir. 1982)); *Koster v. Perales,* 903 F.2d 131, 135 (2d Cir.1990).[7]

■ The catalyst doctrine requires courts to assess the merits of the plaintiff's claim and the level of success the plaintiff has achieved on that claim.[8] Simply put, "it is helpful to identify the relief sought by the plaintiff and compare it with the relief ob-

tained as a result of the suit." *Christopher P. By Norma P. v. Marcus,* 915 F.2d 794, 804 (2d Cir.1990) (applying catalyst doctrine to § 1988 "prevailing party" fee award application pursuant to the Education of the Handicapped Act; application denied in light of judgment against plaintiffs), *cert. denied,* 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991); *see also Koster v. Perales,* 903 F.2d 131, 134–35 (2d Cir.1990) (awarding fees to plaintiff where relief sought and obtained was "of the same general type").

■ The issue presented by this case, although overlooked by the Defendants,[9] is whether fees may be awarded, in the absence of a formal stipulation of settlement, consent decree, or judgment. More specifically, whether the Plaintiffs may be considered a prevailing party when the extrajudicial relief achieved has rendered their legal claims moot. In the voting rights cases, this inquiry is commonly obfuscated as voting rights claims are regularly mooted by referenda.[10] *Cf. Kirksey v. Danks,* 608 F.Supp. 1448,

6. Whether the "catalyst" doctrine is still viable in light of *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), is a question not yet reached by the Supreme Court. *See Hewitt v. Helms,* 482 U.S. 755, 763, 107 S.Ct. 2672, 2677, 96 L.Ed.2d 654 (1987) (stating need not apply the "catalyst" theory for § 1988 award, since plaintiff there did not benefit from alleged change in defendants' conduct); *LaRouche v. Kezer,* 20 F.3d 68, 71 n. 4 (2d Cir.1994) (stating "[t]his court has also adopted the catalyst doctrine ... [which] has not yet been explicitly approved or rejected by the Supreme Court.") (citing *Hewitt*); *see also* Daniel L. Lowery, Note, *"Prevailing Party" Status for Civil Rights Plaintiffs: Fee–Shifting's Shifting Threshold,* 61 U.Cin.L.Rev. 1441, 1467–69 (1993) (arguing that "[t]he Supreme Court in *Farrar* cast a shadow over this entire body of jurisprudence" when "it [ ] suggested that only settlements, consent decrees, and enforceable judgments were sufficient to materially alter the legal relationship of the parties.").

7. The "catalyst" doctrine, or a variant thereof, appears to have been adopted by a majority of the Circuits. *See, e.g., Commissioners Court of Medina County, Texas v. United States,* 683 F.2d 435, 440 (D.C.Cir.1982); *Nadeau v. Helgemoe,* 581 F.2d 275, 281 (1st Cir.1978); *Sullivan v. Pennsylvania Dep't of Labor & Indus.,* 663 F.2d 443, 447–48 (3d Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982); *Child v. Spillane,* 866 F.2d 691, 693 (4th Cir. 1989); *Heath v. Brown,* 858 F.2d 1092, 1094–95 (5th Cir.1988); *Loudermill v. Cleveland Bd. of*

*Educ.,* 844 F.2d 304, 312 (6th Cir.), *cert. denied,* 488 U.S. 941, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988); *Montes v. Thornburgh,* 919 F.2d 531, 538 (9th Cir.1990); *J & J Anderson, Inc. v. Town of Erie,* 767 F.2d 1469, 1473 (10th Cir.1985).

8. Although the "degree of success on the merits does not alter [a] plaintiff's eligibility for a fee award," the courts are permitted to decrease the award as they deem to be appropriate. *LaRouche v. Kezer,* 20 F.3d 68, 71 (2d Cir.1994) (holding plaintiff who achieves temporary relief is not a "prevailing party" for fee shifting statute purposes.).

9. The Defendants fail to grasp the possible ramifications of *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) upon the Second Circuit's catalyst standard. *See* Daniel L. Lowery, Note, *"Prevailing Party" Status for Civil Rights Plaintiffs: Fee–Shifting's Shifting Threshold,* 61 U.Cin.L.Rev. 1441, 1467–69 (1993). Here, Defendants concede the catalyst doctrine governs this case, but argue that the Plaintiffs' suit was not a catalyst for the adoption of a new re-districting plan. (*See* Defs.' Mem. of Law at 4–5.)

10. Plaintiffs are often considered prevailing parties where extrajudicial relief has made their legal claims moot. *See, e.g., Institutionalized Juveniles v. Secretary of Pub. Welfare,* 758 F.2d 897, 911 (3d Cir.1985); *Ramos v. Koebig,* 638 F.2d 838, 845–46 (5th Cir.1981).

1452–53 (S.D.Miss.1985) (citing cases). Here, given the potential broad sweep of *Farrar*, —— U.S. at ——, 113 S.Ct. at 573, and in the absence of Second Circuit comment, this paucity of formal settlement makes for a close question.

Those circuits which have dealt with this issue, however, have found that *Farrar* has not eviscerated the catalyst doctrine in the voting rights context. Indeed, the Fifth Circuit has gone so far as to interpret the language of *Farrar* to uphold the use of the catalyst test, theorizing that "[a] more precise reading of *Farrar*, however, might suggest that a party may prevail, even in the absence of a judgment, consent decree, or direct personal benefit 'if its ends are accomplished as a result of the litigation.'" *Craig v. Gregg County, Texas*, 988 F.2d 18, 21 (5th Cir.1993) (applying catalyst test, in light of *Farrar*, to deny attorney fees pursuant to 42 U.S.C. § 1973*l*(e)) ("*Craig*") (citations omitted).

The Fifth Circuit emphasized that, in the absence of specific relief, a plaintiff must demonstrate that he or she "achieved the goal intended by the lawsuit, and that his [or her] lawsuit 'caused the defendant to remedy the discrimination.'" *Craig*, 988 F.2d at 21 (quoting *Associated Builders and Contractors v. Orleans Parish School*, 919 F.2d 374, 378 (5th Cir.1990)). The *Craig* Court recommended the resolution of such questions of causation through an analysis of the chronological events leading to the voting rights victory:

> Factors suggesting that plaintiffs are not entitled to fees include situations where a government entity is already "diligently working to have a [redistricting plan] submitted" when plaintiffs filed suit; the plan was complete by the time the plaintiffs filed suit; and plaintiffs were not a "substantial factor or a significant catalyst" in creating a fair redistricting plan.

*Craig*, 988 F.2d at 21 (denying fees to plaintiffs) (quoting *Posada v. Lamb County, Texas*, 716 F.2d 1066, 1071–72 (5th Cir.1983)).

The Third Circuit has likewise looked to the "sequence of events," or the catalyst doctrine, in determining whether fees should be awarded in the voting rights context. *See* *Metropolitan Pittsburgh Crusade for Voters v. Pittsburgh*, 964 F.2d 244, 251 (3d Cir.1992) (rejecting district court's application of "but for" causation to voting rights case for a broader "material contributing factor" test).

While "[l]ate arrivers cannot jump the train as it leaves the station and hope to seize prevailing plaintiff status," *Craig*, 988 F.2d at 21 (citing *Posada v. Lamb County, Texas*, 716 F.2d 1066, 1071 (5th Cir.1983)), the Defendants may not deny entry to fare paying passengers. Indeed, as the *Posada* Court noted, "defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways." *Posada v. Lamb County, Texas*, 716 F.2d 1066, 1072 (5th Cir.1983).

Plaintiffs in this action are entitled to prevailing party status under the catalyst doctrine. First, the Complaint sought to replace the at-large City Council electoral system with single member districts, one of which would create a majority African American single member district. Thus, the relief sought was ultimately obtained, consistent with Second Circuit's charge in *Koster v. Perales*, 903 F.2d 131, 134–35 (2d Cir.1990).

Second, the chronology of events in this case establishes that the filing and prosecution, such that it was, of this action was at least part of the causation chain leading to the eventual adoption of New Rochelle's redistricting plan. *See, e.g.*, The Standard Star, April 18, 1993 ("A key element in the tussle over districts is whether the lines that are approved please ... the four black voters who filed a lawsuit against the city to change the city's election system."); Walton Decl. ¶ 6 ("Those who favored the Commission taking up this ... issue constantly referred to the impending ... suit as the 'sword over the city's head' which was forcing us to face that issue.").

Third, there was no evidence submitted to establish that, prior to the suit, the City was committed to a re-districting scheme. *Cf. Craig*, 988 F.2d at 21 (denying fees because government was already working on a re-districting plan well before suit was initiated). Indeed, prior to this suit, the majority of the press concerning the First Commis-

sion revolved around the "strong Mayor" proposal and only incidently referred to the possibility of a re-districting plan. (*See generally* Pls.' Ex D; Defs.' Ex. C.) In addition, success on Plaintiffs' other claims—well beyond the objectives identified by the First Commission—were achieved, including the creation of a majority African American district and the accelerated referendum time frame.

The cases cited by the Defendants are readily distinguishable upon scrutiny of the facts leading to the claimed attorney fees. For example, in *Gerena–Valentin v. Koch*, 739 F.2d 755 (2d Cir.1984), the Court of Appeals upheld the denial of fees where plaintiff's "role was limited to the bringing of a repetitive action and the offering of inconsequential legal arguments." *Id.* at 759. Similarly, in *New York State Ass'n of Career Schs. v. State Educ. Dep't,* 762 F.Supp. 1124 (S.D.N.Y.1991), the Court denied fees where "there is no evidence that plaintiffs' suit was even a minor factor in the eventual passage of legislation." *Id.* at 1126. The Defendants have proffered no evidence to support a theory that this was a mere "copy cat" suit generated for legal fees. The chronology presented here demonstrates that the suit was filed prior to any significant action by either of the Commissions to promote a re-districting plan or to create an African American only district and an expedited referendum.

Accordingly, the Plaintiffs are found to be prevailing parties within the meaning of 42 U.S.C. § 1973*l*(e) and fees are to be awarded subject to the limitations set forth below.

## II. Reasonable Hourly Rates

■ Generally, in awarding attorneys' fees under federal civil rights fee-shifting statutes, courts are directed to use the lodestar method. *Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). The law of the this Circuit further specifies that "the starting point of every fee award ... must be a calculation of the attorney's services in terms of the time he [or she] has expended on the case." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir. 1974) ("*Grinnell I*"). In *Grinnell I,* the

Court of Appeals established what is known as the lodestar approach whereby a court multiplies the number of hours reasonably expended by a reasonable hourly rate to arrive at a reasonable attorneys' fee award. *Grinnell I,* 495 F.2d at 470–71; *see also In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226, 232 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988).

■ In setting the hourly rates of attorney fees—including those for nonprofit legal organizations—it is well settled that courts are to use the prevailing market rates of the relevant legal community. *See Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984) (holding attorneys must demonstrate their fees are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."); *Miele v. New York State Teamsters Conference Pension & Retirement Fund,* 831 F.2d 407, 408–09 (2d Cir.1987) (stating courts may apply prevailing market rates for "Wall Street" associates to fee award for nonprofit organization); *Di Filippo v. Morizio,* 759 F.2d 231, 235 (2d Cir.1985) (noting "the fact that the hourly rates governing fee awards to non-profit legal services organizations are calculated according to prevailing private market rates").

■ The relevant community for a fee determination is the judicial district in which the trial court sits, *see In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226, 232 (2d Cir.1987), in this case, the Southern District of New York. *See also Miele v. New York State Teamsters Conference Pension & Retirement Fund,* 831 F.2d 407, 409 (2d Cir. 1987) (judge may determine reasonable fees based on his or her knowledge of prevailing community rates); *Loper v. New York City Police Department,* 853 F.Supp. 716, 719 (S.D.N.Y.1994) (awarding solo practitioner with offices in both Manhattan and Hoboken at a rate commensurate with the Southern District litigation) ("*Loper*"); *McGuire v. Wilson,* 87 Civ. 6161, 1994 WL 68222, at * 3, 1994 U.S.Dist. LEXIS 2000, at **7–9 (S.D.N.Y. Feb. 25, 1994) (awarding Long Island law firm fees at New York City rate levels for Southern District litigation)

("*McGuire*"); *Shlomchik v. Richmond 103 Equities Co.*, 763 F.Supp. 732, 743–44 (S.D.N.Y.1991) (awarding suburban Philadelphia attorney a higher New York City rate as action was litigated in Southern District).

### A. Lead Counsel's Fees

■ Lead counsel, Randolph Scott–McLaughlin ("Scott–McLaughlin") litigated this action in the Southern District of New York in his capacity as a cooperating attorney with the Center for Constitutional Rights, a nationally renowned civil liberties and civil rights organization, located in Manhattan. The relevant market place is New York City.

Plaintiffs' counsel supports his $300 an hour rate request with documentation as to his qualifications, background, training as well as information concerning his expertise in the area of Voting Rights and civil rights litigation. (*See* Scott–McLaughlin Decl.) Scott–McLaughlin is a graduate of Harvard Law School, a seasoned voting rights litigator,[11] with fourteen years of litigation experience. Plaintiffs' counsel has submitted a copy of a retainer for his work as a voting rights expert on behalf of the Community Service Society of New York, for which he was compensated at a rate of $300 per hour. (Pls.' Ex. A.) Currently, Scott–McLaughlin is an Associate Professor of Law at Pace University School of Law and has published several academic articles concerning civil rights. *See, e.g., Chisom v. Roemer: Where*

Do We Go From Here, 24 Colum. Human Rights Law Review 1 (1993); *Bray v. Alexandria Women's Health Clinic: The Supreme Court's Next Opportunity to Unsettle Civil Rights Law*, 66 Tul.L.Rev. 1357, 1362–71 (1992).

Accordingly, Plaintiffs' counsel will be awarded an hourly fee of $300 per hour, a rate commensurate with fee awards at the partner level in this District. *See, e.g., Pierce v. F.R. Tripler & Co.*, 770 F.Supp. 118, 121 (S.D.N.Y.1991) (awarding Judith Vladeck, "widely recognized as an expert in the field of employment discrimination litigation," a fee rate of $300 per hour), *modified on other grounds*, 955 F.2d 820 (2d Cir.1992); *Loper*, 853 F.Supp. at 720 (awarding $250 per hour to acknowledged First Amendment litigator and solo practitioner with "intermediate" experience); *Soler v. G & U, Inc.*, 801 F.Supp. 1056, 1056 (S.D.N.Y.1992) (awarding Farmworker Legal Services of New York attorneys fees ranging from $185 to $250 per hour); *Cabrera v. Fischler*, 814 F.Supp. 269 (E.D.N.Y.1993) (awarding $200 per hour; citing civil rights cases fee awards ranging from $175–$250), *aff'd in part, remanded*, 24 F.3d 372, 393 (2d Cir.1994).[12]

### B. Law Students

■ The Defendants claim that a $75 per hour fee award for law students is excessive.[13] However, paralegal and law clerk

---

11. Mr. Scott–McLaughlin was lead counsel on the well known voting rights case, *Butts v. City of New York*, 779 F.2d 141 (2d Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986), which challenged the secondary primary law. In addition, he has litigated *Goosby v. Town Board of Hempstead* and *France v. Cuomo*.

12. *Cf. Monaghan v. SZS 33 Assocs., L.P.*, 154 F.R.D. 78, 85 (S.D.N.Y.1994) (awarding fee range $250 to $300 for experienced partners; $120 to $180 for associates over three year time period); *McGuire*, 1994 WL 68222, at *3, 1994 U.S.Dist. LEXIS 2000, at **7–9 (awarding fee range $190 to $225 per hour for partners, and $105 to $160 per associates for two year time period); *Ortiz v. Regan*, 777 F.Supp. 1185 (S.D.N.Y.1991) ($250 per hour), *aff'd in part, rev'd in part, remanded*, 980 F.2d 138 (2d Cir. 1992); *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1477, 1481 (E.D.N.Y.1989) (awarding $150 to $250 per hour for partners;

$50 to $120 per hour for associates for work performed in 1988), *rev'd on other grounds*, 907 F.2d 1295, 1326 (2d Cir.1990); *Williams v. City of New York*, 728 F.Supp. 1067 (S.D.N.Y.1990) ($200 per hour for work performed in 1988–89); *Suarez v. Ward*, 88 Civ. 7169, 1993 WL 158462, 1993 U.S.Dist. LEXIS 6308 (S.D.N.Y. May 13, 1993) ($200 per hour for work performed in 1988–92); *Carrero v. New York City Hous. Auth.*, 685 F.Supp. 904 (S.D.N.Y.1988) ($150 per hour for less experienced attorneys), *remanded*, 890 F.2d 569, 581–82 (2d Cir.1989); *Wilder v. Bernstein*, 725 F.Supp. 1324 (S.D.N.Y.1989) ($200–250 per hour for work performed in 1987–89), *rev'd on other grounds*, 944 F.2d 1028 (2d Cir. 1991).

13. The Defendants also assert, without persuasive authority, that billing for law students is "duplicative." (*See* Defs.' Mem. of Law at 23–24.) However, the Courts in this district often

billing rates ranging from $70 to $85 per hour are acknowledged to be well within reason.[14] *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 286–89, 109 S.Ct. 2463, 2470–72, 105 L.Ed.2d 229 (1989) (holding paralegals and law clerks may be billed separately at market rates pursuant to local market practice); *see also Loper,* 853 F.Supp. at 720 (S.D.N.Y. 1994) (awarding attorney $70 to $85 per hour for paralegal tasks); *McGuire,* 1994 WL 68222, at 3, 1994 U.S.Dist. LEXIS 2000, at **8–9 (awarding paralegals fee range of $70 to $85 per hour).

Accordingly, Leslie Morioka and Dan Cherner ("Cherner") will be compensated at the requested $75 per hour for time spent while they were law students. Cherner's requested hourly rate of $110 subsequent to his admission to the bar is also granted.[15]

### C. Travel Time

 Second, Defendants object to the remuneration of Plaintiffs' counsel at his full hourly rate for his time spent traveling for the ends of the litigation. A rate reduction is appropriate and Plaintiffs' counsels' travel time will be compensated at 50% of his hourly rate. *Cf. Loper,* 853 F.Supp. at 720 (reducing counsel's hourly compensation rate by 50% for time spent in travel); *Jennette v. City of New York,* 800 F.Supp. 1165, 1170 (S.D.N.Y.1992) (same); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1296, 1321–22, 1349 (E.D.N.Y.1985), *aff'd in part, rev'd in part,* 818 F.2d 226 (2d Cir.1987) (same).

Accordingly, all travel time billed by counsel will be reduced by 50%.

award fees for conferences between multiple attorneys and their junior associates, including law students. *See, e.g., McGuire,* 1994 WL 68222 at *3–4, 1994 U.S.Dist. LEXIS 2000 at **10–11; *Baratta v. S.D. Cohn & Co.,* 656 F.Supp. 1, 5–6 (S.D.N.Y.1985) (allowing fee recovery for more than one attorney attending depositions or performing other work); *Williamsburg Fair Housing Committee v. Ross–Rodney Housing Corp.,* 599 F.Supp. 509, 518 (S.D.N.Y.1984).

**14.** *Pastre v. Weber,* 800 F.Supp. 1120, 1125 (S.D.N.Y.1991), is not inapposite. In that case,

### III. Plaintiffs, Counsel Describes Services Rendered With Adequate Specificity

 A fee application must be supported by contemporaneous time records which describe with specificity the work done. *New York State Assoc. for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). The "burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987) (rejecting time records with one word descriptions for an entire day's work). The Supreme Court has found that "counsel, of course, is not required to record in great detail how each minute of his [or her] time was expended[,] but at least counsel should identify the general subject matter of his [or her] time expenditures." *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. Plaintiffs' counsel's billing records meet this burden.

In *Orshan v. Macchiarola,* 629 F.Supp. 1014, 1019 (E.D.N.Y.1986), the court disallowed a claim for fees for time supported only by such vagaries as "prepare correspondence" and "review correspondence." However, such is not the case here. As a general matter, Plaintiffs' counsel's billing records list the date, the concise description of the work product, and the amount of time expended. As such, they appear to be detailed enough to meet the standards set forth by the Second Circuit.

the Court reduced the requested $80 rate basis to $50 because the plaintiff had failed to proffer adequate support for the requested rate basis. Here, Plaintiffs have provided ample documentation supporting the requested rate basis. (*See* Prof. Solow Aff., Pls.' Ex. U; David Brodsky Aff., Pls.' Ex. V).

**15.** Defendants have not seriously contested Cherner's post-admission billing rate at $110 per hour.

█ Additionally, the Defendants challenge the proposed compensation of Plaintiffs' counsel for such activities as attending Commission hearings. (*See* Defs.' Mem. of Law at 27–28.) In the absence of persuasive authority to the contrary, it is evident that the time spent testifying before the Commissions on behalf of the Plaintiffs as well as meeting with clients, is uniquely consistent with the nature of Voting Rights litigation. Given that the Plaintiffs acceded to the Defendants' request to stay this litigation for a minimum of nine months for the very reason that the Second Commission needed time to consider proposals—including the Plaintiffs'—it is unreasonable not to compensate Plaintiffs' counsel for its time and effort during that period for such activities as monitoring the referendum and attending public hearing on behalf of their clients.

### IV. Plaintiffs Are Allowed Attorneys' Fees For Time Spent Recovering Fees

█ Defendants next seek to disallow all counsel fees for time spent on this application. Previously, this Court has disallowed fee awards for time spent recovering fees under the doctrine that general contract provisions for the shifting of attorney's fees do not authorize an award for time spent justifying those fees. *See McGuire*, 1994 WL 68222, at 4–5, 1994 U.S.Dist. LEXIS 2000, at \*\*12–13 (citing *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1266–67 (2d Cir.1987); *Peter Fabrics, Inc. v. S.S. Hermes*, 765 F.2d 306, 315 (2d Cir.1985); *Banca Della Svizzera Italiana v. Cohen*, 756 F.Supp. 805, 809–10 (S.D.N.Y.1991); *Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 444, 154 N.Y.S.2d 10, 14, 136 N.E.2d 484, 488 (1956); *Swiss Credit Bank v. Int'l Bank, Ltd.*, 23 Misc.2d 572, 573–74, 200 N.Y.S.2d 828 (Sup. Ct.1960); *Zauderer v. Barcellona*, 130 Misc.2d 234, 237, 495 N.Y.S.2d 881, 883 (Civ. Ct.1985)).

However, it is well settled that "time reasonably spent by plaintiff's attorneys in establishing their fee" pursuant to fee shifting statutes, such as § 1988 and § 19731(e), is "compensable." *See Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir.1979), *aff'd on other grounds*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). Oddly enough, compensation for time spent recovering fees under § 1988 litigation appears to be the one civil rights question about which there is near unanimity among the Circuits. *See, e.g., Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir. 1978); *Ross v. Horn*, 598 F.2d 1312, 1322 (3d Cir.1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); *Young v. Kenley*, 641 F.2d 192, 195 (4th Cir.1981), *cert. denied*, 455 U.S. 961, 102 S.Ct. 1476, 71 L.Ed.2d 681 (1982); *Johnson v. Mississippi*, 606 F.2d 635, 638 (5th Cir.1979); *Bond v. Stanton*, 630 F.2d 1231, 1235 (7th Cir.1980), *cert. denied*, 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 454 U.S. 1063 (1981); *Jones v. MacMillan Bloedel Containers, Inc.*, 685 F.2d 236, 239 (8th Cir.1982); *In re Nucorp Energy, Inc.*, 764 F.2d 655, 660 (9th Cir. 1985); *Love v. Mayor, Cheyenne*, 620 F.2d 235, 237 (10th Cir.1980); *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1179 (D.C.Cir. 1985); *see also Commissioner, INS v. Jean*, 496 U.S. 154, 162, 110 S.Ct. 2316, 2321, 110 L.Ed.2d 134 (1990) (citing with approval Second Circuit's holding regarding compensation for fee awards under § 1988 in *Gagne v. Maher*, 594 F.2d 336, 344 (2d Cir.1979)).

However, the question of reasonableness in this case is troublesome. Plaintiffs' counsel has expended 201.25 hours out of a grand total of 433.50 hours in this action on their fee, that is, 46% of their entire litigation effort.

Defendants assert that the number of hours spent on the fee application is excessive and should be reduced. Plaintiffs counter that they were forced to expend such an enormous amount of time on the fee application because the Defendants had notified them that they were unwilling to even negotiate an appropriate fee award. (Letter from Fontana to Scott–McLaughlin, Dec. 12, 1993; Pls. Ex. R.) Plaintiffs further contend that the 200 hours claim are not inordinate as compared to the 320 hours spent by the plaintiffs in *Williamsburg Fair Hous. Comm. v. Ross–Rodney Hous. Corp.*, 599 F.Supp. 509, 521 (S.D.N.Y.1984).

The Plaintiffs' claim that this case is somehow analogous is simply implausible. In *Williamsburg*, the hours spent on the fee award was a mere 12% of the total amount of

time spent in litigation. Additionally, in that case, the Plaintiffs were required to re-write briefs, as a result of a change in the Circuit law as well as research the ramifications of the bankruptcy of the defendant in that case. Indeed, the only similarity between the two cases appears to be their respective defendants' vigorous opposition to the fees motion.

The Second Circuit has upheld fee awards where the time spent on the fee application was up to 24% of the total time claimed. *See Trichilo v. Secretary of Health & Human Services,* 823 F.2d 702 (2d Cir.), *reaff'd and extended,* 832 F.2d 743 (2d Cir.1987). Other courts within this Circuit have awarded fee application awards in the range of 8 to 24 percent of the total time claimed. *See, e.g., Soler v. G & U, Inc.,* 801 F.Supp. 1056, 1065 (S.D.N.Y.1992) (reducing fee time spent on fee application to 10.6% of total time claimed); *Burr by Burr v. Sobol,* 748 F.Supp. 97 (S.D.N.Y.1990) (awarding fees where time spent on fee application was 24% of total time claimed); *Mantel v. Niagara Mohawk Power Corp.,* 84 Civ. 2339, slip op. at 3, 1986 WL 644 (S.D.N.Y. Jan. 2, 1986) (Sand, J.) (time spent on fee application reduced from 35% to 8% of total time claimed); *Williamsburg Fair Housing Comm. v. Ross–Rodney Housing,* 599 F.Supp. 509, 521–22 (S.D.N.Y. 1984) (12% of total time claimed).

Accordingly, balancing the relative simplicity of this fee application as compared that involved in the *Williamsburg* case with the fact that the Plaintiffs cooperated with the Defendants' request to put this litigation in abeyance, the amount of time billed by Plaintiffs' counsel for this fee application will be reduced by 50%—34 hours for Scott–McLaughlin and 66.5 hours for Cherner. The time spent on Plaintiffs' fee application thus will constitute 23% of total time claimed, consistent with other fee awards in this Circuit.

In sum, Plaintiffs' fee award is granted, having been reduced by 50% for time spent in travel and on this application.

### Conclusion

Plaintiffs' counsels' fee application is hereby granted in conformance with the findings set forth above. The County Board seeks a determination that they are not liable for any fees awarded; that application, which is unopposed, is granted. This case will be closed upon the submission of the fee order. Settle order on notice.

It is so ordered.