Warren R. COLBERT and Marie
Johnson–Colbert, Plaintiffs,

v.

FURUMOTO REALTY, INC. and
Selina Kim, Defendants.

No. 99 CIV 12323 (WCC).

United States District Court,
S.D. New York.

June 1, 2001.

Law Offices of Leonard N. Flamm (Leonard N. Flamm, Norman Mednick, of counsel), New York City, for Plaintiffs.

Lovett & Gould(Jonathan Lovett, Kim Berg, of counsel), White Plains, NY, for Furumoto Realty, Inc.

O'Connor, McGuinness, Conte, Doyle & Oleson (Peter H. Kim, of counsel), White Plains, NY, for Selina Kim.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Warren R. Colbert and Marie Johnson–Colbert, African Americans, brought this action against defendants Furumoto Realty, Inc. ("Furumoto Realty"), Selina Kim, and Kapo Kasanda[1] pursuant to 42 U.S.C. §§ 1981, 1982 and N.Y. EXEC. LAW §§ 296.3(b), 296.5(a), and 297(4) for housing discrimination based upon race. On January 11, 2001, after a three-day trial, the jury returned a verdict in favor of plaintiffs in the amount of $5,000 in compensatory damages and $30,000 in punitive damages, for a total award of $35,000. Defendant Furumoto Realty now moves for judgment as a matter of law pursuant to FED. R. CIV. P. 50(b) or, in the alternative, for a new trial and to strike the punitive damages award pursuant to FED. R. CIV. P. 59. Plaintiffs cross-move for attorneys' fees and costs in the amount of $78,092.10 pursuant to 42 U.S.C. § 1988. For the reasons stated hereinafter, defendant Furumoto Realty's motion

1. On January 8, 2001, plaintiffs withdrew their claims against defendant Kasanda.

is denied and plaintiffs are granted attorneys' fees and costs in the amount of $49,399.96.

## BACKGROUND

Prior to November 1999, Kasanda, fee owner of a single-family house located on Sunset Drive in White Plains, engaged the services of defendant Furumoto Realty and its agent, defendant Kim, to find a residential lessee. The house was listed on the Westchester Multiple Listing Service with a rental price of $3,300 a month for two years. Kasanda is African, the president of Furumoto Realty is Japanese and defendant Kim is Korean.

In November 1999, after viewing the listing of Kasanda's home, Mary Searle, a real estate agent for Century 21 Mancuso Realty, arranged to show the house to Mrs. Johnson–Colbert. After Mrs. Johnson–Colbert inspected the house, Searle contacted defendant Kim to notify the latter that her clients were interested in renting the property. At this time, defendant Kim asked Searle whether plaintiffs were Italian or Asian. Defendant Kim also allegedly asked whether plaintiffs were African American and said that if they are African American, then "there was going to be a problem because there were no blacks on Sunset and that the neighbors would be very upset." (Trial Tr. at 39.) Searle then informed defendant Kim that her clients were African American, but nevertheless wanted to rent the house. Defendant Kim contends that she never asked whether the plaintiffs were African American, but that information was supplied voluntarily by Searle. (*Id.* at 233–34.)

Allegedly defendant Kim initially refused to allow plaintiff Mr. Colbert to view the inside of the house, but on November 14, 1999, changed her mind, stating that "he might not even like it anyway, so yes, you can go in." (*Id.* at 43.) Mr. Colbert was shown the inside of the house and expressed an interest in renting it for the listed price. (*Id.* at 378–79.) At this time, defendant Kim informed Searle that the terms had changed from $3,300 per month for two years to $3,300 per month for the first year, $3,500 per month for the second year and a $175 gardening fee. Plaintiffs rejected this proposal as "unacceptable." (*Id.* at 53, 379.) The house was subsequently rented to a corporation for eleven months at $3,500 per month with $150 for gardening; the actual tenant was Caucasian. (*Id.* at 199, 222, 246–49.)

In May 2000, after the house was rented, defendant Kim wrote a letter to the Westchester County Board of Realtors in response to a housing discrimination grievance filed by Searle against defendants. In that letter she admitted that she asked whether plaintiffs were "Italian ... I wanted to hear if they had a steady job. I asked Mary Searle are they branch officer from Asia?" (Mednick Aff. Opp. Mot. New Trial ¶ 3(a), Ex. 6.) She also stated that she received information regarding plaintiffs' credit history and that they seemed like good tenants, but that Searle never called back to discuss Kasanda's offer. (*Id.*)

At trial, defendant Kim testified that she inquired into plaintiffs' background because the majority of her tenants are corporations. Her inquiry was made in an attempt to determine whether she was dealing with a corporation with a budget limitation. (Trial Tr. at 156–57, 233.) However, she claims that she thought that, because of her Korean accent, Searle might not understand her question and attempted to clarify her intent by asking whether plaintiffs were Italian or Asian (*id.* at 156–57, 239–41); although what she really wanted to know was whether they

were employed by an Italian or Asian corporation. (*Id.* at 239–41.)

## DISCUSSION

### I. *Defendant Furumoto Realty's Rule 50(b) Motion*

Pursuant to FED. R. CIV. P. 50(a)(2), a party may make a motion for judgment as a matter of law "at any time before submission of the case to the jury" and at which time must "specify the judgment sought and the law and facts on which the moving party is entitled to the judgment." If such motion is denied, then pursuant to FED. R. CIV. P. 50(b), the moving party must renew its request for judgment as a matter of law "at the close of all the evidence" and "no later than 10 days after entry of judgment." It is well settled that the failure to comply with the procedural requirements set forth in FED. R. CIV. P. 50(b) precludes the renewed motion submitted subsequent to trial. *See Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 129 (2d Cir.1999). These procedural requirements may be excused if the trial court indicated that the motion for judgment as a matter of law need not be renewed at the close of all the evidence and "the party opposing the motion could not reasonably have thought that the movant's 'initial view of the insufficiency of the evidence had been overcome and there was no need to produce anything more in order to avoid the risk of such judgment.'" *Id.* (quoting *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 587 (2d Cir. 1987)). It may also be excused if "in order to 'prevent a manifest injustice' in cases 'where a jury's verdict is wholly without legal support.'" *Pahuta,* 170 F.3d at 129 (quoting *Varda, Inc. v. Insurance Co. of North America,* 45 F.3d 634, 638 (2d Cir. 1995)).

As a threshold matter, we must decide if the procedural requirements have been satisfied. Plaintiffs argue that defendant Furumoto Realty failed to comply with Rule 50(b) because it moved for judgment as a matter of law at the close of plaintiffs' evidence but failed to renew its motion at the close of all its evidence. Indeed, plaintiffs contend that after the conclusion of their direct case, defendant Furumoto Realty called Kasanda in its own case. We are puzzled by this allegation.

In this case, defendant Furumoto Realty moved to dismiss the action at the close of plaintiffs' case based upon plaintiffs' "failure to make out a prima facie case." (Trial Tr. at 437.) However, neither of the defendants called any witnesses to the stand after the motion was made. Indeed, Kasanda testified out of turn on the day prior thereto. (*Id.* at 186–207.) Therefore, it appears that defendant Furumoto Realty did make its motion at the close of all the evidence.

■ However, this does not end the inquiry. Plaintiffs also argue that defendant Furumoto Realty raised new issues in its memoranda of law that were not raised pre-verdict. This argument is not without merit. A Rule 50(b) motion may only be made on the basis of grounds that were specifically raised at the close of evidence. *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 53–54 (2d Cir.1993). "The motion 'must at least identify the specific element that the defendant contends is insufficiently supported.'" *Pittman v. Grayson,* 149 F.3d 111, 119 (2d Cir.1998) (quoting *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 286 (2d Cir.1998)). Although the specificity requirement must be viewed in the context of the entire colloquy, *see Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 136 (2d Cir. 1999), "[a] generalized challenge is inadequate." *Pittman,* 149 F.3d at 119.

In this case, defendant Furumoto Realty's motion for judgment as a matter of law did not satisfy the specificity requirement under Rule 50(b). The entire relevant colloquy was as follows:

THE COURT: Do you want to make your application now, Mr. Lovett, or would you prefer to do it in the morning?

MR. LOVETT: I can do it now. It will be very short.

THE COURT: All right.

MR. LOVETT: I simply move to dismiss this case for failure to make out a prima facie case.

THE COURT: I'll reserve decision on that motion.

MR. LOVETT: Thank You.

(Trial Tr. at 436–37.)

In this renewed motion for judgment as a matter of law, defendant Furumoto Realty contends that because plaintiffs rejected Kasanda's counteroffer of $3,300 per month for the first year and $3,500 per month for the second year with $175 in gardening fees, plaintiffs terminated the negotiations between the parties. However, the colloquy between defense counsel and the Court did not identify this issue as the one as to which defendant Furumoto Realty contends there was insufficient evidence for the jury to return a verdict in favor of plaintiff. *See also Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir.1993) (holding that the statement "[d]efendants move for a directed verdict" failed to put the plaintiff on notice of the deficiency in its proof). The purpose of the specificity requirement is to give the non-moving party notice of the defects in its proof so that it may cure such defects before the case goes to the jury. *See Galdieri–Ambrosini*, 136 F.3d at 286; *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993). It is clear that the vague statement made by defense counsel did not put plaintiffs on notice of

any specific defects in their proof. Because the specificity requirement was not satisfied, judgment as a matter of law may not be granted unless the result is "required to prevent manifest unjustice." ' *Galdieri–Ambrosini*, 136 F.3d at 287 (citations omitted).

In this case, there was evidence that plaintiffs accepted Kasanda's original lease terms, but rejected Kasanda's higher counteroffer. However, that does not preclude plaintiffs from asserting their civil rights with respect to defendant Kim and Furumoto Realty. There was evidence from which the jury could reasonably conclude that defendant Kim blocked plaintiffs' efforts to rent 19 Sunset Drive by, *inter alia*, conveying a lack of inclination to rent to African Americans, imposing higher price terms than those authorized by her principal, *see infra* Part II, and delaying Mr. Colbert's viewing of the house. Accordingly, we conclude that the jury verdict did not result in a manifest unjustice and defendant Furumoto Realty's motion for judgment as a matter of law is denied.

## II. *Defendant Furumoto Realty's Rule 59 Motion*

■ Rule 59 provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues." Rule 59 motions are resolved under a less stringent standard than Rule 50(b) motions. In contrast to Rule 50(b) motions, under Rule 59 a district court may independently weigh the evidence and need not view the evidence in the light most favorable to the non-movant. *See Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992); *Sharkey v. Lasmo (Aul Ltd.)*, 55 F.Supp.2d 279, 283 (S.D.N.Y.1999) (Conner, J.), *aff'd*, 214 F.3d 371 (2d Cir.2000). A district court may grant a new trial "if it 'is convinced that the jury has reached a seriously erroneous result or that the ver-

dict is a miscarriage of justice.' " *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 875 (2d Cir.1992) (citing *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988)); *see Piesco,* 12 F.3d at 345 (reaffirming the "seriously erroneous" standard). A new trial may be granted even where substantial evidence supports the jury's verdict. *See Song,* 957 F.2d at 1047. However, the Second Circuit has cautioned that "the jury is empowered and capable of evaluating a witness's credibility, and this evaluation should rarely be disturbed." *Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 158 (2d Cir.1992); *see DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir.1998).

Contrary to defendant Furumoto Realty's contention, the jury did not reach a seriously erroneous result nor was the verdict a miscarriage of justice. We concede that certain facts make us question whether defendant Kim did in fact state that "there were no blacks on Sunset." These facts include, *inter alia,* that defendant Kim never rented or sold any premises on Sunset Drive, does not reside in White Plains, (Trial Tr. at 225–26) and, that at the time of the negotiations with plaintiffs, she did not know that Kasanda was African. However, the question remains as to why she would inquire about plaintiffs' nationality.

First, we are not persuaded that defendant Kim could not be understood by Searle because of her Korean accent and limited English vocabulary. This Court and the jury heard Kim's testimony and had no serious difficulty in understanding her. Moreover, Kasanda communicated with defendant Kim exclusively in English and at all times understood what she said to him. (*Id.* at 200–01.)

Second, there is reason to doubt defendant Kim's explanation that by asking whether plaintiffs were Italian or Asian, she was attempting to ascertain whether plaintiffs were employees of a corporation. A reasonable person in Searle's position would not likely understand that defendant Kim was inquiring into the corporate associations of plaintiffs by asking whether they were Italian or Asian. Furthermore, it would be reasonable for a jury to conclude that defendant Kim also asked whether plaintiffs were African American in view of her admitted question whether they were Italian or Asian.

Defendant Furumoto Realty also argues that a new trial should be granted because Searle was not a credible witness. It is true that some of Searle's trial testimony was inconsistent with her prior deposition testimony as well as Mr. Colbert's testimony. But many of these inconsistencies were inconsequential. For example, whether Searle told plaintiffs on the phone or at the Sunset house about the race-related conversation with defendant Kim is unimportant.

There are some substantive inconsistencies in Searle's testimony. At trial, she testified that she immediately told her boss about her conversation with defendant Kim, but at her deposition she testified that she told no one about the race-related conversation with defendant Kim until the following Saturday. (*Id.* at 103–04.) However, this inconsistency does not mean that defendant Kim was free from blame. Indeed, there were inconsistencies with defendant Kim's testimony. In the May 10, 2000 letter and at trial defendant Kim stated that she requested of Searle either $3,400 or $3,500 per month for a one-year rental. (*Id.* at 176–78.) However, at trial Kasanda testified that he only recalled authorizing a counteroffer of $3,300 per month for the first year and $3,500 per month for the second year with gardening fees. (*Id.* at 204–05.) He did not recall authorizing defendant Kim to

request these higher numbers. Indeed, at trial defendant Kim's testimony became even more contradictory as she testified that Kasanda never authorized her to tell Searle that he wanted $3,300 for the first year, $3,500 for the second year and $175 gardening fee. (*Id.* at 176–78.)

Furthermore, defendant Furumoto Realty argues that Searle prepared a falsified financial statement, listing Mrs. Johnson–Colbert's annual salary as $25,000 and Mr. Colbert's annual salary over $150,000. (*Id.* at 72–73, 78–80.) Although grossly negligent on her part, it does not appear that the information was intentionally falsified by Searle. Searle based her report on the 1996 financial information provided by Mr. Colbert in 1996 where it was stated that he made at least $130,000. (*Id.* at 72.) Because Mr. Colbert remained at the same profession for three years, Searle testified that she felt comfortable stating that his salary was $150,000 per year. (*Id.* at 72–73.) We find it persuasive that Searle was not required to view plaintiffs' W–2 forms. (*Id.* at 73.) Furthermore, it is the responsibility of the listing agent to run the credit check on clients and in 1996 Searle was not the listing agent for plaintiffs. (*Id.*)

In sum, none of the above inconsistencies warrant a disturbance of the jury's conclusions. Defendant Furumoto Realty's motion for a new trial is denied.

### III. *Punitive Damages*

■ Defendant Furumoto Realty's third alternative request for relief is for remittitur, which "is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co., Inc.,* 917 F.2d 1320, 1328 (2d Cir.1990). On a motion for remittitur, the standard is "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir.1990). If the district court elects to order a remittitur, it "should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl,* 917 F.2d at 1330.

The purpose of punitive damage awards is to punish the defendant and to deter the defendant and others from engaging in similar conduct in the future. *See Smith v. Wade,* 461 U.S. 30, 54, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). The decision to award punitive damages is a discretionary moral judgment made by the jury. *See id.* at 52, 103 S.Ct. 1625. Nevertheless, there is a "concern about punitive damages that 'run wild.'" *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). "[T]he amount of punitive damages should not be greater than the amount reasonably necessary to fulfill the purposes of punishment and deterrence or the punitive damage award becomes, in part, a windfall to the individual litigant." *Niemann v. Whalen,* 928 F.Supp. 296, 300 (S.D.N.Y.1996) (Conner, J.) (citing *Aldrich v. Thomson McKinnon Sec., Inc.,* 756 F.2d 243, 249 (2d Cir.1985), *aff'd,* 107 F.3d 3 (2d Cir.1997)). Therefore, "[p]unitive damages may be awarded for a civil rights claim if 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves *reckless or callous indifference to the federally protected rights of others.'*" *Tolbert v. Queens College,* 242 F.3d 58, 77 (2d Cir. 2001) (quoting *Smith,* 461 U.S. at 56, 103 S.Ct. 1625) (emphasis in quotation). "These terms 'pertain to the defendant's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Tolbert,* 242 F.3d at 77 (quoting *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)).

In *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court established the three factors that must be used when determining whether the award of punitive damages was excessive in a state court case. In *Lee v. Edwards,* 101 F.3d 805 (2d Cir.1996), the Second Circuit held that the same factors should be applied when reviewing the award of punitive damages in a federal case. *See id.* at 809 n. 2. The three factors are: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) a comparison of the damage award and the civil or criminal penalties that could be imposed for comparable misconduct. *See Gore,* 517 U.S. at 575–85, 116 S.Ct. 1589; *see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* — U.S. ——, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (reaffirming *Gore* factors).

Of these factors, the degree of reprehensibility is "the most important indicium of the reasonableness of a punitive damages award." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. Whether conduct is sufficiently reprehensible to support a punitive damages award depends on certain aggravating factors such as whether the: injury was purely economic, *see id.* at 576, 116 S.Ct. 1589; conduct was violent, *see Lee,* 101 F.3d at 809; defendant acted with deceit or malice, *see id.;* and defendant is a recidivist. *See id.*

We fail to see how racial discrimination is not sufficiently reprehensible to warrant a punitive damages award. We also conclude that $30,000 is not so egregious as to shock the judicial conscience. Defendant Kim testified that she was aware of the applicable civil rights laws which prohibit racial discrimination. (Trial Tr. at 168–70; ·Mednick Aff. Opp. Mot. New Trial ¶¶ 3(b)-(d), Exs. 8–10.) It was reasonable for the jury to conclude that defendant Kim maliciously prevented plaintiffs' from securing this house simply because of their race. The jury had the opportunity to listen to defendant Kim to determine whether her English was so poor that she thought Searle could not understand an inquiry as to whether plaintiffs were employees of foreign corporations and that she therefore asked about their nationality.

The disparity of the harm suffered by plaintiffs and the punitive damages award is "the.second and perhaps the most commonly cited indicium of an unreasonable or excessive punitive damages award." *Gore,* 517 U.S. at 580, 116 S.Ct. 1589. We do not find that defendant Kim's due process rights were violated by the fact that the ratio of punitive damages to compensatory damages is 6-to-1. In *Gore,* the Supreme Court stated that "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula.... low awards of compensatory damages may properly support a higher ratio than high compensatory awards." *Id.* at 582, 116 S.Ct. 1589. Indeed, the Supreme Court has held that a "punitive damages award of 'more than 4 times the amount of compensatory damages ... [does not] cross the line into the area of constitutional impropriety.'" *Id.* at 581, 116 S.Ct. 1589 (quoting *Haslip,* 499 U.S. at 23–24, 111 S.Ct. 1032).

The only decision which defendant cites in support of its motion to strike or reduce the punitive damages award is *Bisignano v. Korff,* No. 00 Civ. 5640 (S.D.N.Y. Mar. 22, 2001). In that case, punitive damages in the amount of $160,000 and compensatory damages in the amount of $20,000 were assessed against a municipal official who abused her power in violation of the plaintiff's First Amendment right of association. *See id.* at 1, 3, 4. Judge Brieant set aside the punitive damages because there was

no evidence that would support a conclusion that the Mayor of the Village of Port Chester was motivated by evil motive or intent or reckless or callous indifference to the plaintiff's federal rights. *See id.* at 3, 4, 5. Because the determination of the propriety of a punitive damages award must be based on facts of each individual case, and because there was no objection to the substance of the Court's charge to the jury as to the proper basis for such an award, we see no reason to upset their verdict in that respect.

Finally, §§ 1981 and 1982 do not limit the amount of punitive damages that may be imposed. In cases dealing with housing discrimination, courts in this district have upheld punitive damages awards as high as $410,000. *See, e.g., Broome v. Biondi,* 17 F.Supp.2d 211, 229 (S.D.N.Y.1997). Accordingly, the punitive damages award will be allowed to stand.

## IV. *Attorneys' Fees* [2]

### A. *42 U.S.C. § 1988*

Section 1988 provides in pertinent part that "[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The Supreme Court has stated that the prevailing party should recover attorneys' fees "unless special circumstances would render such an award unjust." *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct.

1933, 76 L.Ed.2d 40 (1983) (citations omitted). Because no circumstances exist that would render an award of attorneys' fees unjust, this Court must now pursue a two-step analysis.

The initial inquiry concerns whether the plaintiff is a prevailing party under the statute. After crossing this "statutory threshold," the Court must then determine whether the fee is "reasonable." *Lilly v. County of Orange,* 910 F.Supp. 945, 949 (S.D.N.Y.1996) (Conner, J.) (quoting *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933); *see also Hensley,* 461 U.S. at 434, 103 S.Ct. 1933 (holding that the hours not billed to a client cannot be billed to an adversary). In this case, there is no dispute that plaintiffs are a prevailing party. The only issue is whether the claimed attorneys' fees are reasonable.

In determining reasonable attorneys' fees, the district court must consider the "lodestar figure based upon the number of hours reasonably expended by counsel on the litigation multiplied by a reasonable hourly rate." *Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir.1997) (citing *Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1159 (2d Cir.1994); *New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1140 (2d Cir.1983). The lodestar figure provides an objective basis by which to set the fees. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. "The party seeking the award must submit evidence supporting his claim of hours worked and rates charged." *Id.*

---

**2.** When plaintiffs' moved for attorneys' fees, they failed to serve or file a notice of motion or a memoranda of law in violation of Local Rules 7.1 and 7.2. They merely submitted an affidavit in support thereof. Obviously, this perfunctory attempt to support their application for attorneys' fees will be considered when determining whether the 20 hours billed in connection with the instant fee application was reasonable. However, the affidavit did cite the statute as to which plaintiffs were authorized to make the fee application as well as four cases in support thereof. Accordingly, the motion will be decided on its merits.

However, the district court has broad discretion in determining the amount of attorneys' fees awarded to the prevailing party. *See id.* at 437, 103 S.Ct. 1933; *Luciano,* 109 F.3d at 115.

### 1. *Reasonable Hourly Rates*

A reasonable hourly rate is one "in line with those prevailing in the community for similar services by lawyers of reasonable comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In order to establish the reasonable hourly rates of associates, the party seeking the award may provide the court with affidavits from similarly situated attorneys. *See Cruz,* 34 F.3d at 1160.

■ Leonard N. Flamm, a seasoned attorney with 32 years of experience litigating both state and federal anti-discrimination laws, (Flamm Aff. ¶ 2), seeks payment for 67.5[3] hours spent in connection with this case at a rate of $325 per hour, for a total of $21,937.50. (*Id.* ¶¶ 8, 26.) Flamm has successfully argued two discrimination cases before the United States Supreme Court and over 50 cases in both federal and state court as well as co-authoring a treatise in the area of employment law and discrimination. (*Id.* ¶¶ 2–3.) Norman Mednick, an attorney with 37 years of experience and a former New York State Administrative Law Judge in the New York State Division of Human Rights, has "extensive experience in all phases of discrimination-based civil litigation, including both court and administrative agency proceedings." (*Id.* ¶ 4.) Mednick seeks payment for 109.41[4] hours spent in connection with this case at a rate of $300 per hour. (*Id.* ¶¶ 8, 26.) Finally, Eden Mauro, a 1997 graduate of Brooklyn Law School, whose work consists basically of case preparation, depositions, court appearances and editing memoranda of law, seeks payment for 3.5 hours at a rate of $255 per hour. (*Id.* ¶¶ 5, 8, 26.)

In this case, plaintiffs' attorneys submit the affirmation of Wayne Outten in support of their requested rates. Outten, a 1974 graduate from New York University, has clerked for a federal district judge, taught at New York University, authored several books in employment law, founded the National Employment Lawyers Association, and litigated in the area of employment discrimination. (Outten Affm. ¶¶ 4–5.) Outten presently charges his clients $500 per hour. (*Id.* ¶ 6.)[5]

Flamm, Outten, and Mednick have roughly comparable experience. We have already recognized that $300 per hour is within reason for a lead attorney, *see Knoeffler v. Town of Mamakating,* 126 F.Supp.2d 305, 311 (S.D.N.Y.2000), and other courts have recognized that $325 per hour is also reasonable. *See Versace v. Versace,* No. 98 Civ. 0123, 2000 WL 739569, at *1, 3 (S.D.N.Y. June 8, 2000); *Maddalone v. United Bhd. of Carpenters,* No. 95 Civ. 2112, 1999 WL 269913, at *1

---

**3.** This Court calculated Flamm's hours at 68 hours. Because Flamm is requesting only 67.5 hours of compensation, he will not be compensated for the excess .5 hours.

**4.** Initially, Mednick sought payment for 116.72 hours spent in connection with this case. However, Mednick added the hours incorrectly. The hours submitted on the time sheet total 107.39. Mednick also inadvertently omitted two hours of his time spent at Mrs. Johnson–Colbert's deposition. (Pls. Reply Mem. Supp. Mot. Att'y Fees at 8 n. 3, 19 n. 5.) Therefore, the total amount of time expended by Mednick in this case is 109.39 hours or approximately 109.4 hours.

**5.** Flamm also submits the affirmation of William Frumkin in support of his requested fee. This affirmation carries no weight. It merely states the conclusion that the amount of time spent by plaintiffs' attorneys was reasonable.

(S.D.N.Y. May 4, 1999); *see also Knoeffler,* 126 F.Supp.2d at 313 (holding that "New York City rates have dictated the amount of attorneys' fees in the Southern District of New York, irrespective of the actual office location"). Accordingly, the time charges of Flamm and Mednick will be computed at their requested rates of $325 and $300 per hour respectively.

■ However, it is clearly unreasonable to compensate Mauro at a rate of $255 per hour. First, plaintiffs' attorneys did not submit an affirmation by any attorney of similar experience suggesting that such requested compensation was reasonable. Nor did they cite any case law to substantiate the request. Outten's declaration that $255 is "within the range of market rates for attorneys with comparable experience to that of Plaintiffs' counsel" is unpersuasive. (Outten Affm. ¶ 10.) Our own research has revealed that $180–200 is reasonable for attorneys with four to six years experience and $130–150 is reasonable for attorneys with one to three years experience. *See Marisol A. ex rel. Forbes v. Giuliani,* 111 F.Supp.2d 381, 386–87 (S.D.N.Y.2000); *Robinson v. Instructional Sys. Inc.,* 105 F.Supp.2d 283, 286–87 (S.D.N.Y.2000); *National Helicopter Corp. of America v. City of New York,* 96 Civ. 3574, 1999 WL 562031, at *6 (S.D.N.Y. July 30, 1999); *Ward v. New York City Transit Auth.,* 97 Civ. 8550, 1999 WL 446025, at *10 (S.D.N.Y. June 28, 1999). Because Mauro worked on this case at a time when she had no more than three years' experience, her time charges will be computed at a rate of $140 per hour.

## 2. *Reasonable Amount of Time Spent*

Defendants argue that certain of plaintiffs claimed attorneys' fees are unreasonable, particularly with respect to claimed travel time and excessiveness of hours.

### a. *Travel Time*

■ Flamm and Mednick request their full hourly rate for the time spent traveling to court and their adversary's office, e.g., 15 hours. They have obviously overlooked our prior decisions in which we reduced attorneys' fees for travel time by 50% because of the lack of productivity that results when an attorney travels to appointments. *See, e.g., Lilly,* 910 F.Supp. at 951 (relying on *Cohen v. West Haven Bd. of Police Comm'rs,* 638 F.2d 496, 505 (2d Cir.1980), which held that different rates of compensation may be awarded for different tasks); *Broome,* 17 F.Supp.2d at 234–35 (S.D.N.Y.1997); *Williams v. New York City Hous. Auth.,* 975 F.Supp. 317, 324 (S.D.N.Y.1997); *Wilder v. Bernstein,* 975 F.Supp. 276, 283–84 (S.D.N.Y.1997); *Loper v. New York City Police Dep't,* 853 F.Supp. 716, 720 (S.D.N.Y.1994). We might have allowed full reimbursement for the travel time spent if plaintiffs submitted an affidavit stating that work was accomplished during that time, but no such affidavit was submitted. Therefore, in exercise of this Court's broad discretion in determining reasonableness of attorneys' fees, *see Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir.1979), *aff'd,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), the travel time is hereby decreased by 50%. Mednick's claimed 5 hours travel time will be reduced to $750 and Flamm's claimed 10 hours travel time will be reduced to $1,625, for a total of $2,375.

### b. *Excessiveness of Hours*

A review of time records maintained by plaintiffs' counsel demonstrates that some of the time sought to be compensated by plaintiffs' counsel is duplicative, excessive or otherwise unreasonable. For example, Mednick and Flamm allege that they spent a combined total of 20.5 hours preparing the instant fee application.

■ A prevailing party is entitled to reimbursement for the time expended in the preparation of the fee application. *See Gagne,* 594 F.2d at 343–44. Indeed, "courts within this Circuit have awarded fee application awards in the range of 8 to 24 percent of the total time claimed." *Natural Resources Defense Council, Inc. v. Fox,* 129 F.Supp.2d 666, 675 (S.D.N.Y. 2001) (quoting *Davis v. City of New Rochelle,* 156 F.R.D. 549, 561 (S.D.N.Y. 1994)); *see also Davis,* 156 F.R.D. at 561 (stating that in *Trichilo v. Secretary of Health & Human Servs.,* 823 F.2d 702 (2d Cir.1987), *reaff'd and extended,* 832 F.2d 743 (2d Cir.1987), the Second Circuit has upheld fee awards where the time spent on fee application constituted 24% of total time claimed). However, the claimed 20.5 hours is clearly excessive in this case. Instead, Flamm and Mednick shall be compensated for 15.5 hours of the time expended on the fee application. Each attorney shall be deducted 2.5 hours of time.

■ In *Knoeffler,* the defense attorney expended approximately 7.25 hours in preparing his fee application in which he submitted a memorandum of law in support of his position. 126 F.Supp.2d at 316–17. In contrast, neither Flamm nor Mednick submitted any memorandum of law in support of the instant fee application even though they did submit a reply memorandum of law. Moreover, Flamm contends that he expended 12.25 hours preparing an affidavit twelve pages in length and which provides four legal citations. This is clearly excessive. In *White v. White Rose Food,* 86 F.Supp.2d 77 (E.D.N.Y.2000), *rev'd for other reasons,* 237 F.3d 174 (2d Cir.2001), Judge Spatt of the Eastern District of New York similarly found Flamm and Mednick's claimed time spent in preparation of their fee application excessive. He also reduced their hours to 15. *See id.* at

80 (stating that "[c]ounsel merely needed to collect the relevant time sheets, draft a short affidavit and memorandum of law and appear for oral argument.").

Defendant Furumoto Realty contends that other entries were excessive. Examples include expending: .5 hours drafting two letters that were one and two sentences in length; .5 hours preparing two deposition notices which were identical in form except for the name of the deponent and the time of the deposition; .5 hours drafting a letter on August 16, 2000; .5 hours for drafting two letters on November 30, 2000; 3.25 hours reviewing submissions on December 8 and 21, 2000; and .5 hours drafting a letter on December 28, 2000. (Berg Aff.¶ 7, Ex. 4.) We disagree. It is clear that several of the letters drafted by plaintiffs' attorneys forwarded attached documents that had to be read and analyzed. Furthermore, the notices of depositions had to be cleared with the defense counsel and a court reporter had to be contacted.

Furthermore, we agree with plaintiffs that the .75 hours spent serving plaintiffs' trial documents and faxing a memorandum to this Court should be compensated at a full attorney's rate. The courts in this district are in agreement that "[f]iling, delivery, service of papers and other similar administrative tasks are not usually considered recoverable expenditures of time for attorneys' fees." *Broome,* 17 F.Supp.2d at 236 (citing *Society for Good Will to Retarded Children v. Cuomo,* 574 F.Supp. 994, 999 (E.D.N.Y.1983), *vacated on other grounds,* 737 F.2d 1253 (2d Cir. 1984)); *Giuliani,* 111 F.Supp.2d at 390–91. Instead, these are considered clerical tasks and should be billed in accordance therewith, e.g., $50 per hour. *See Lawson v. City of New York,* No. 99 Civ. 10393, 2000 WL 1617014, at *2 (S.D.N.Y. Oct.27, 2000). However, in this case, it appears that the

entries "service of Plaintiffs' trial documents on Defendants" and "Fax memo to Judge Conner" do not describe the actual clerical tasks but the preparation of the trial documents prior to their service and the writing of the memorandum to this Court. Our conclusion is based on the fact that there are no other entries on these dates that compensate for the writing or preparation of the documents in question. Therefore, plaintiffs' counsel shall receive full compensation for such activities.

### 3. *Adjustment of the Lodestar*

■ Although there is a " 'strong presumption' that the lodestar represents the 'reasonable fee,' " the consideration of other factors may be lead to an increase or decrease of such figure. *City of Burlington v. Dague*, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (citations omitted). For example, the degree of success may warrant an adjustment of the amount awarded. *See LaRouche v. Kezer*, 20 F.3d 68, 71 (2d Cir.1994). The party requesting a departure from the lodestar has the burden of establishing the propriety of such departure in the calculation of a reasonable fee. *See Dague*, 505 U.S. at 562, 112 S.Ct. 2638; *Grant v. Martinez*, 973 F.2d 96, 101 (2d Cir.1992).

The purpose behind § 1988 was to "ensure 'effective access to the judicial process.' " *Hensley*, 461 U.S. at 429, 103 S.Ct. 1933 (quoting H.R. REP. No. 94–1558, p. 1 (1976), U.S.Code Cong. & Admin.News 1976, p. 5908). Both the Senate and House Reports refer to twelve factors that should be considered in determining the amount of the fee:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3). the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Hensley*, 461 U.S. at 430 n. 3, 103 S.Ct. 1933 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974); AMERICAN BAR ASSOCIATION CODE OF PROFESSIONAL RESPONSIBILITY DR 2–106). Flamm and Mednick argue that the lodestar should be increased by 35% because (1) they initially accepted the case on a contingency fee basis, (2) the case was undesirable and (3) they achieved great success. We cannot agree to such a large increase.

The contingency of the fee does not alone justify such an increase. *See Dague*, 505 U.S. at 560–66, 112 S.Ct. 2638. The lodestar itself "accounts for the risk counsel take in providing representation without a fee." *Amalgamated Clothing & Textile Workers Union v. Wal–Mart Stores, Inc.*, No. 92 Civ. 5517, 1994 WL 74871, at *6 (S.D.N.Y. Mar.7, 1994), *aff'd*, 54 F.3d 69 (2d Cir.1995). However, the success of plaintiffs in this case does aid our decision in adjusting the lodestar by some percentage. The attorneys won a civil racial housing discrimination case against a Japanese real estate broker, Korean agent, and an African home owner. However, the success does not warrant the requested increase. Prior to trial, plaintiffs withdrew their claims against Kasanda. We therefore believe that a contingency increase of 10% will be sufficient to insure competent representation of indigent plaintiffs in the future, particularly in view of the facts that there were no pre-trial motions, only six

persons were deposed before trial and the trial lasted only three days.

 We also agree with defendants that the lodestar should be decreased because Flamm sat "second seat" to Mednick at the trial. The Second Circuit has stated that prevailing parties are not barred as a matter of law from receiving fees for the assistance of a second attorney during the course of discovery or court proceedings. *See Carey,* 711 F.2d at 1146. However, it is reasonable to reduce the fee request when both of the attorneys who participated in the trial seek to be compensated at top "first seat" rates, and when some of the work was duplicative or unnecessary. *See Williams,* 975 F.Supp. at 326–27. For example, in *White,* Judge Spatt reduced Flamm's total hours by 10% because he merely observed Mednick during trial. *See* 86 F.Supp.2d at 79–80. Similarly, in this case, we fail to see the necessity of Flamm's presence during trial because most of his time was spent merely observing Mednick. Mednick, an attorney with more than 30 years experience litigating state and federal discrimination cases, was fully capable of trying this case alone or with a less experienced attorney to assist with the exhibits. We therefore conclude that Flamm's hours should by reduced by 33.33%.

### 4. *Costs*

Pursuant to § 1988, in addition to compensation for attorneys' fees, plaintiffs are also allowed to recover their attorneys' expenses. *See Carrero v. New York City Hous. Auth.,* 685 F.Supp. 904, 909 (S.D.N.Y.1988), *aff'd in part and rev'd in part,* 890 F.2d 569 (2d Cir.1989). A court will generally award "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *Giuliani,* 111 F.Supp.2d at 401 (quoting *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 763 (2d Cir.1998)).

On February 27, 2001, plaintiffs moved to tax costs against defendants pursuant to Local Rule 54.1. In connection therewith, plaintiffs sought reimbursement for the $150.00 filing fee, $630.53 for deposition transcripts and $90.00 in witness fees. On that same day, the Clerk of the Court reduced the witness fees by $45.00 and taxed costs against defendants in the amount of $825.53. Plaintiffs now seek additional reimbursement in the amount of $128.38 for postage, Federal Express delivery, train and parking fare and on-line computer research. (Pls. Reply Mem. Supp. Mot. Att'y Fees at 19; Flamm Aff. ¶ 28, Ex. 2.)

This Court calculated the requested costs at $188.38. However, this includes a $12.00 expense for which the description of the activity involved is illegible. Therefore, this cost is disallowed. The other expenses appear reasonable. Defendants did not object to any specific item, but requested that the application for costs be completely rejected. However, we believe that the prevailing parties are clearly entitled to these costs under the Rules. Accordingly, plaintiffs are awarded additional costs in the amount of $176.38, for a total amount of $1,001.91.

### 5. *Calculation*

| | | | |
|---|---|---|---|
| Flamm | $325 per hour * 67.5 hours * 33.33% reduction | = | $14,625.73 |
| Mednick | $300 per hour * 109.4 hours | = | $32,820.00 |
| Mauro | $140 per hour * 3.5 hours | = | $ 490.00 |
| | | | $47,935.73 |
| Reduction for travel | | | $ 2,375.00 |
| Reduction time spent in connection with fee application | | | $ 1,562.50 |

| | |
|----------------------------|-----------:|
| | $43,998.23 |
| Multiplier for contingency | 1.10 |
| | $48,398.05 |
| Costs | $ 1,001.91 |
| Total | $49,399.96 |

## CONCLUSION

For the foregoing reasons, defendant Furumoto Realty's motion for judgment as a matter of law or in the alternative a new trial or remittitur is denied. We conclude that plaintiffs are entitled to attorneys' fees and costs in the amount of $49,399.96. SO ORDERED.