NEW ROCHELLE VOTER DEFENSE FUND, Samuel L. Spady, Calvin L. Walton, Leroy W. Mitchell, Ronald H. Williams on behalf of themselves and all other similarly situated persons, Plaintiffs,

v.

CITY OF NEW ROCHELLE, City Council of the City of New Rochelle, and Westchester County Board of Elections, Defendants.

Roberto Lopez, Intervenor.

New Rochelle Republican Committee, New Rochelle Conservative Committee, New Rochelle Independence Committee, Mario Scarano, Debra Mills, Gerson Lopez, Plaintiffs,

v.

City Of New Rochelle, City Council of the City of New Rochelle, Mayor Timothy Idoni, Councilman Michael Boyle, Council Woman Christina Selin, Council Woman Beuenia Brown, Councilman Joseph Fosina, Councilman Noah Bramson, Council Woman Marianne Sussman, City Clerk Dorothy Allen, Westchester County Board of Elections, Carolee Sunderland, Commissioner, Reginald Lafayette Commissioner, Defendants.

No. 03 CIV. 3965.

United States District Court, S.D. New York.

Dec. 10, 2003.

Kevin Christopher Reilly Esq., Mount Vernon, Randolph M. McLaughlin Esq., Bronx, Daniel L. Pagano Esq., Peekskill, NY, for Plaintiffs.

Robert David Goodstein Esq., Goodstein & West, Esqs., New Rochelle, NY, for Intervenor.

Alan D. Scheinkman Esq., Delbello, Donnellan, Weingarten, Tartaglia, Wise & Wiederkehr, Carol F. Arcuri Esq., Charlene M. Indelicato, Westchester County Attys Office, White Plains, NY, for Defendants.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

These consolidated actions, brought under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 *et seq* and the First, Four-

teenth and Fifteenth Amendments to the Constitution of the United States, were tried before the Court without a jury on June 23, 24 and 26, 2003. The post-trial submissions of the parties have been received and considered. The Court now makes its Findings of Fact and Conclusions of Law following trial.

Plaintiffs in both actions attack the reapportionment plan of the City of New Rochelle for city council districts adopted following a public hearing on April 29, 2003. Consistent with the City Charter following the decennial census the City reapportioned its six council districts. Plaintiffs, African–Americans, claimed to be aggrieved by the configuration of New District 3 adopted as part of that plan, effecting a material change in the population and boundaries of Old District 3, a majority minority district.

### Parties

Plaintiffs in Action No. 1 above filed their lawsuit on May 27, 2003. Plaintiff New Rochelle Voter Defense Fund is an *ad hoc* unincorporated association formed for the purpose of bringing the case. The individual Plaintiffs, Samuel L. Spady, Calvin L. Walton, Leroy W. Mitchell, and Ronald H. Williams are all African–American citizens and residents of the City of New Rochelle claiming to be aggrieved by the reapportionment. The City of New Rochelle is the principal Defendant in the case. The City Council of the City is not a separate entity and lacks the capacity to be sued.

Intervenor, Mr. Roberto Lopez, is a Hispanic–American citizen and resident of the City of New Rochelle. The position of the Intervenor is that he is reasonably satisfied with the present boundaries of New District 3 and supports the position of the Defendants. At trial, Counsel for Mr. Lopez expressed concern that if the Court ordered any specific relief in favor of the

Plaintiffs following trial, that such relief might conceivably be detrimental to the rights and interests of Hispanic voters in New Rochelle and stated that Mr. Lopez intervened essentially to defend the *status quo* and to have standing to object to any remedy which this Court might order.

Plaintiffs, in Action No. 2, are political committees of the Republican, Conservative and Independence Parties and individuals, at least one of whom is an African–American voter resident in the Third District, who claim to be aggrieved by the new district lines. Defendants are the City of New Rochelle and the members of its City Council sued individually.

While both complaints contain references to a possible class action, no purpose will be served by maintaining this litigation as a class action. No motion to declare a class was ever filed and no notice was given to the members of any purported class. The class allegations are hereby stricken from the pleadings.

The Westchester County Board of Elections is sued in both actions but has no application before the Court for any specific relief. The Board of Elections and its Commissioners are proper parties in order that any relief granted by the Court may be effectuated. Venue and subject matter jurisdiction are not in dispute.

### Standing

Standing is not an issue in the case since Defendants concede and the Court finds, that at least one Plaintiff has standing to sue as a person aggrieved by the reapportioned boundary lines of Council District 3.

### The Pleadings

Plaintiffs in the First Action allege the unlawful dilution of the voting strength of the African–American community with respect to New District 3 which, is merely a

plurality Black district while Old District 3 was a majority Black District.[1]

In support of their First Claim, beginning at paragraph 31 of the Complaint, Plaintiffs allege a history of private and official racial discrimination in the City "including but not limited to discrimination against African–Americans with respect to the exercise of the franchise by the use *inter alia* of At Large elections for the Council [prior to 1993]." They allege that African–Americans are politically cohesive and reside primarily in geographically compact and contiguous neighborhoods and that the reapportionment plan unlawfully dilutes their voting strength by dividing compact and contiguous African–American areas and communities of interest, all in violation of Section 2 of the Voting Rights Act of 1965.

As a second claim, Plaintiffs allege (¶ 43) that the Council "disregarded traditional districting principles when it fragmented Rochelle Heights, a predominantly African–American community with shared interests and did so to dilute their voting strength in violation of law."

As a third claim, Plaintiff LeRoy W. Mitchell asserts that he resided in Old District 3 and that Defendants intentionally, and in order to prevent him from being able to seek nomination and election as a candidate [in 2003] for City Council in District 3, "deliberately removed his home residence from District 3." The basis for the claim was that a separate provision of the City Charter required candidates for the Council to have resided in the District for a six month period preceding their nomination. The City Code, Section 9A, has since, following the suggestion of this Court, been amended to provide that within those years in which a reapportionment

takes place, candidates from anywhere in the City may run in any District providing they reside in the District when they take office. The Third Claim in Action No. 1 is therefore dismissed as moot.

Plaintiffs in Action No. 1 seek a declaratory judgment that the redistricting plan violates Section 2 of the Voting Rights Act and the First, Fourteenth and Fifteenth Amendments to the United States Constitution and an Order directing the Council to establish district lines that are consistent with law.

The First Claim pleaded in the Complaint in Action No. 2, alleges dilution of the voting strength of African–American voters. The Second Claim pleaded raises the issue of eligibility in a year of reapportionment of a candidate for Council Member who has not been a resident of the new District for a period of at least six months preceding the date of his or her election. That claim is dismissed as moot for reasons stated above with respect to the Third Claim in Action No. 1.

The Third Claim in Action No. 2 raises the issue that the legal description of the Second and Third Districts overlaps. This was apparently true, and the result of a scrivener's error. This has been corrected. The issue has thus been rendered moot, and the Third Claim is dismissed.

At the close of the trial, an application for preliminary injunctive relief in this litigation was denied by the Court without prejudice. The 2003 election was run in accordance with the new District lines. The granting of preliminary injunctive relief so close to election day would have imposed a significant burden on the Westchester County Board of Elections and the

---

1. Because the attorneys expert witnesses and exhibits use the word "Black" alternatively to "African–American", this Court follows the same practice for purposes of these findings and conclusions.

City of New Rochelle, and, as a practical matter as it turned out, the composition of the City Council, as ultimately elected, would have been no different in this particular year.

*Facts*

The City of New Rochelle, New York was founded in 1688 by French Huguenot settlers from the City of La Rochelle, France. It had a population in the 2000 Census of 72,182 residents within an area of approximately 10.67 square miles, including 9.3 miles of shoreline on Long Island Sound. Prior to 1993, like most cities of the same size in this state, the local governmental body was elected At Large, and consisted of six city council members and the mayor. The terms of council members were three years and staggered so that two openings were filled each year. Like most cities in Westchester County, the population varies greatly in terms of economic status, education and opportunity. The relevant Census figures for 1990 and 2000 are as follows: [2]

|                   | 1990   | 2000   |
|-------------------|--------|--------|
| African–American  | 21.56% | 19.47% |
| Hispanic          | 10.78% | 20.08% |
| White and Other   | 67.66% | 60.45% |

While the Council was being elected At Large, African–American candidates had difficulty in obtaining office. For the first time, in 1965, an African–American, Joseph Evans, a Republican, was appointed to an unexpired term in the Council and then won three full terms in At Large elections, following which he was defeated in 1975 by a white candidate.[3] When African–Americans such as Plaintiff Samuel Spady, who was a Democratic candidate in the At Large Election in 1989, sought election to the Council during the period of At Large voting, their presence on the ticket was apparently helpful to the other candidates of the same political party, but none achieved election. Mr. Spady himself lost by a very small margin. After Mr. Evans was defeated, no African–American candidate was elected to the City Council in At Large voting. (Tr. 306).

In circumstances resonant of the fact situation in *Goosby v. Town of Hempstead,* 180 F.3d 476 (2d Cir.1999), and for probably the same reasons, the African–American community became restive and dissatisfied because of the perceived non-accessibility of public office and began to agitate for the elimination of At Large voting, as was ordered by the Court for the Town of Hempstead in *Goosby.*

The difference between New Rochelle and Hempstead was that New Rochelle is much smaller and the office holders and public in New Rochelle were less resistant to the claims of the African–American population. On March 13, 1991, a small group of residents led by Mr. Ossie Davis, a show business personality, brought litigation in this Court (*Davis v. City of New Rochelle,* 156 F.R.D. 549 (S.D.N.Y.1994)) (Judge Sweet). While the *Davis* case was pending, the City granted the relief which the *Davis* Plaintiffs sought; that is, the election of the City Council by equal districts, although the precise district lines proposed by Mr. Davis and his Co–Plaintiffs were

---

2. Mathematically adjusted with respect to 2000 to account for persons who self-reported membership in two races, as permitted for the first time by census authorities. See Ex. FF.

3. Mr. Evans, who was personally known to the writer, was a highly regarded political figure whose reputation extended beyond the borders of his City. His selection by Republican Party officials to fill an unexpired term and his subsequent election must be considered as exceptional, resulting from a decision by white district leaders which did not originate in the African–American community.

not adopted. Judge Sweet found that this litigation had served as a catalyst in bringing about the change and awarded legal fees to the prevailing Plaintiffs. This Court concludes, as did Judge Sweet, that the *Davis* Plaintiffs had a substantial likelihood of success on the merits had the matter proceeded to trial.

In 1990, for reasons unrelated to the issues in this case, a Charter Revision Commission had been formed in the City. The Commission recommended a district system for electing single members of the City Council. This was done in part to satisfy the claims of the *Davis* Plaintiffs and, in part, also because the City of New Rochelle has a large number, approximately fifty-five, of neighborhood associations within the City. These neighborhood associations came to pass over the years where developers cut up the farms and large estates into single-family house lots or housing complexes, and are mostly distinguished today by stone pillars erected at point of entry. The residents of particular neighborhoods seemed to develop specialized needs and interests, which did not involve the City as a whole, for which they sought legislative action on the part of the City Council (or protection from such action) and it was believed, reasonably, that electing the Council by Districts would lead to a City government more responsive to the needs of the neighborhood association members than a City government where the Council was elected At Large.

The Charter Revision Commission recommended that the Council elections be shifted to a District system but it also recommended a so-called "strong mayor system" in lieu of the City Manager System in which a non-political full time City official operates the day-to-day affairs of the City and the elected Mayor deals only with policy and public relations and presides as a voting member of the City Council. The two propositions went to the public for referendum in November 1991. The strong mayor revision was rejected by the voters, resulting in the failure to adopt a plan for district election of the City Council.

A Second Charter Revision Commission formed in 1992 presented a proposal for election of the Council on a District basis except for the Mayor who would run City-wide. This recommendation passed and was adopted in a special election of March 2, 1993.

Thereafter, the City went about drawing the District lines consistent with the 1990 Census, and created Old District 3 with the expressed intention that it would be an African–American Majority District. The population of Old District 3 was divided as follows:

|  | 1990 | 2000 |
|---|---|---|
| African–American | 60.5% | 54.4% * |

* (Net Loss of Blacks was 150, total population increase was 941).

The New Rochelle City Charter requires that the Council Districts "shall be of substantially equal population, of convenient and contiguous territory, in as compact a form as practicable and shall thereafter be reapportioned by the Council every ten years on the basis of the Decennial Census figures published by the Bureau of Census of the United States Department of Commerce" (Charter Section 9A, Exhibit 10).

Reapportionment in this case was necessary. The Old Council District had a total population deviation of twenty-four percent, considerably in excess of the ten percent deviation permitted by the relevant caselaw.

The Plaintiffs have offered to the Court a plan of redistricting created by them with the aid and assistance of their expert witness, Dr. Beveridge. The Court de-

clines to consider the Beveridge Plan and limits its adjudication to the issue of whether the redistricting proceedings followed in connection with New District 3 unlawfully dilute the voting strength of the African–American population. Defendants concede, as they must, that, if ordered to do, it is physically possible for them to rectify any discrimination against the African–American voters inherent in the new district lines.

The City Council appears to have equalized population within the new Districts with almost total success. The population deviation is as follows:

| New District | Percent Deviation |
|---|---|
| 1 | − 0.23% |
| 2 | − 0.19% |
| 3 | − 0.32% |
| 4 | + 0.39% |
| 5 | + 0.50% |
| 6 | − 0.15% |
| **Total Deviation** | 0.81% |

The new plan has held together the neighborhood associations except for three: Rochelle Heights, an African–American neighborhood which has been, in Plaintiff's words, "fragmented", Bracey Houses and Greenwood Lake, also predominantly African–American.

The actions of the City Council in redrafting the lines of District 3 seem to have been intentional, and done with the awareness of the effect of their work, in turning a majority minority district, intentionally created as such in 1993, into a plurality minority district. Old District 3 is a central city district, surrounded on all sides by other districts. Prior to reapportionment, it was the largest district in population. Adjustment for population could have been effected merely by removing from Old District 3 some part of the area represented. The new plan did not do this. A major part of a housing project that was in Old 3 and largely African American was transferred to New District 2, and two identifiable largely African American neighborhoods, Greenwood Lake and Rochelle Heights were divided and transferred in part out of Old District 3. At the same time, parts of Election Districts 3 and 4, predominantly White and Republican, were shifted from District 2 into New District 3. It is not seriously disputed that these changes were intentional and this Court infers that the Defendants intended the probable consequences of their actions.

After all this had been accomplished, New District 3 and the City had the following make-up:

Party Enrollment 2003

| | New District 3 | | Entire City | |
|---|---|---|---|---|
| Republican | 614 | 11.2% | 8,951 | 25.5% |
| Democratic | 3,661 | 66.6 | 17,175 | 47.5 |
| Independence | 142 | 3.0 | 838 | 2.0 |
| Conservative | 38 | .7 | 464 | 1.0 |
| Liberal | 31 | .6 | 213 | .5 |
| Right to Life | 29 | .5 | 140 | .3 |
| Green | 12 | .2 | 59 | .1 |
| Working | 9 | .1 | 60 | .1 |
| None | 961 | 17.1 | 8,273 | 23.0 |
| Total | 5,497 | 100.0% | 36,173 | 100.0% |

New District 3

Black, Non–Hispanic, per Dr. Beveridge, Plaintiffs' expert, 44.5%

Same, per Mr. Brace, Defendants' expert (combo method), 45.88%

The Court accepts the total population figures of Mr. Brace, Defendants' expert, as more likely valid, since the method used adjusts most accurately for those self-reporting under the new census rules which permit persons to list both "White" and "Black" as their race. The difference between the experts on this point is too slight to be significant. More striking is the disagreement of the experts as to voting age citizens. Using different methods, Mr. Brace estimated New District 3 to contain 49.86% Black voting age citizens, (Tr. 605–6), while Dr. Beveridge estimated 46.4%. This Court need not choose between the two experts on this particular

issue. Each presented a logical basis for his approach. The relative ages of the population in the district will not remain static until the next decennial census, and our case law is founded on *population,* not voting age citizens. In order for a majority minority district to be effective, there must be some significant figure in excess of 50.0% of the voting age population. Voting age people who move within the district less than thirty days prior to election cannot vote; convicted felons, a class which predominates among the poor, cannot vote, and experience shows that an edge above one-half remains necessary in light of minority voter lassitude. See generally, the testimony of Mr. Brace on this issue. (Tr. 525–30 and 536–37)

### Discussion

Our discussion begins, as it must, with the consideration of the plain meaning of the statute. Section 2 of the Voting Rights Act as codified in 42 U.S.C. § 1973 reads as follows:

Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State of political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

By a course of conduct which can only be characterized as intentional and deliberate, the City Council diluted a majority minority district to a plurality minority district. In doing so, they removed part of at least two neighborhoods which were largely African–American while professing to hold together almost all of the remaining neighborhoods represented by associations within the City. They did this recognizing that the residents of a neighborhood such as Rochelle Heights have a community of interest which has been recognized ever since the Council was elected on a district basis. While Old District 3 was too large in population and Defendants have done a highly commendable job of equalizing the population in the Districts, besides taking areas out of Old District 3 which was necessary to reduce its size, they added more and took out more. The areas added had a lesser proportion of African–American population than those taken out.

Essentially in the redistricting, Plaintiffs and the residents of Old District 3 were deprived of the benefit of their bargain when they agreed ten years earlier with the City that the new district lines mooted the *Davis* case. The facts of this case invoke the decision of our Court of Appeals in *Goosby v. Town of Hempstead,* 180 F.3d

476 (2d Cir.1999): That case in turn relies on *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

Applying the *Gingles* factors as analyzed in *Goosby,* this Court must consider first whether the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district" (*Goosby,* 180 F.3d at 491). This is clearly established. Old District 3 was geographically compact and, when created, had an African–American population of 60.5% in 1993. Changes occurred in the population of Old District 3 for which Defendants are not responsible, primarily gentrification of the older housing units in the central City, many of which consisted of large low-priced Victorian homes on small lots which are readily rehabilitated to be comfortable, modern dwellings. This was a factor beyond the control of any of the parties. The redistricting, however, was the stroke which changed the 3rd Council District from a district sufficiently large and geographically compact to constitute a majority minority single member district, to a mere plurality district. It was not necessary to do this, and no legitimate reason for doing so is suggested in the record.

The next requirement imposed in *Gingles* as explained in *Goosby* is that the minority group must be able to show that it is politically cohesive. This cohesiveness was recognized in 1993 and remains in existence today. The proof at trial on this issue was, in many instances, subject to two or more possible interpretations. Records of election contests presented by both sides tended to involve citywide elections and, in many cases, elections in units far larger than the City of New Rochelle itself. Idiosyncratic facts altered the interpretation to be placed on some of the contests relied on by both sides. On balance, this Court concludes that Plaintiffs

have demonstrated sufficient African–American cohesiveness to satisfy this element of their claim.

The third *Gingles* requirement is that the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it in the absence of special circumstances usually to defeat the minority's preferred candidate. As observed earlier, clearly this was the case prior to 1993, when Council members were elected At Large. There is no reason to believe that attitudes and practices have changed materially since seven years ago, when the City first agreed to propose, for public referendum, that the Council members be elected in separate districts. The Court, in *Gingles,* also identified relevant factors mentioned in the Senate Report which included the history of voting related discrimination in the State or political subdivision:

> the extent to which voting... is racially polarized, and the extent to which the political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination...; exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment and health which hinder their ability to participate effectively in the political process... and the extent to which members of the minority group have been elected to public office in the jurisdiction (*Goosby,* 180 F.3d at 491).

These factors to the extent relevant at all, generally point in favor of Plaintiff's claims.

The regrettable history of discrimination in employment, housing and education in the Westchester County area is too well known to require extended comment by

this Court. The nearby City of Yonkers has had more than sufficient litigation concerning the quality and fairness of its housing policies and educational system, and New Rochelle has its own history with regard to racial discrimination in education. One of the early cases, post *Brown*, involved discrimination in education in the city schools of New Rochelle. See *Taylor v. Board of Education [of New Rochelle]*, 191 F.Supp. 181 (S.D.N.Y.1961); 195 F.Supp. 231 (S.D.N.Y.1961), also 221 F.Supp. 275 (S.D.N.Y.1963), all by the Hon. Irving R. Kaufman, then a District Judge, but later Chief Judge of our Court of Appeals. Judge Kaufman found:

> The inference is inescapable that the Board's deliberate intransigence and inflexibility for the last eleven years in the face of public pressures and expert advice were motivated by a desire to continue Lincoln School as a racially segregated school, and thus not to alter the racial balance in the city's other elementary schools. This becomes especially clear when the Board's conduct subsequent to 1949 is examined against the background of the pre–1949 gerrymandering and transfer of white children. No other rational purpose can be attributed to the Board's almost fanatically rigid adherence to district lines which were established in the first instance out of a desire to separate whites and Negroes.
>
> \* \* \* \* \* \*
>
> When this course of conduct is viewed in its totality, the desire to maintain segregation is clear. (191 F.Supp. at 195).

While the Decree in *Taylor* was modified by the District Court in 1963, and the present City administration had no part in and bears no responsibility for the sins of the past, the adverse effects of a history of long continued educational discrimination in a community are long-lasting into the future, especially when the census reports for the same minority community, even today, show lower than average per capita earnings and inferior housing. The conditions just mentioned support a conclusion of polarized voting and that the African-American community is affected by specialized political issues relating to local government, not affecting the general population, which render the community politically cohesive. Insofar as concerns polarized voting, the events prior to 1993 are sufficiently current to establish that it still exists. See *Goosby*, 180 F.3d at 492–93.

### Slating

*Goosby* and *Gingles* speak of "the minority's preferred candidate". Identification of the minority's preferred candidate leads us to questions of slating. An analysis of the complex New York Election Law is beyond the scope of these findings. It is clear that the major political parties, through their party organization, generally control who is nominated to serve as a candidate for a position such as Council Member of the City of New Rochelle.

The basic organization of a political party in New York is the County Committee. See New York Election Law, § 2–100 *et seq.* With exceptions not material, there are two committee members in each Election District. The Election District is the smallest and the basic political unit in the State for purposes of registration and voting, since its inhabitants must all be persons entitled to vote for the same candidates. That is to say, an Election District consists of persons who are all in the same Congressional District, State Senate District, State Assembly District, County Legislative District, same municipality, and where applicable City Council District. An Election District has one Polling Place. Committee members are nominated by petition signed by the enrolled members of the political party resident in the election

district, and any other enrolled party member may contest the position of County Committee member, commonly referred to as "District Leader", should he or she wish to do so. With exceptions not material, an Election District may not exceed more than 1,150 voters pursuant to Section 4–100, 3a, N.Y. Election Law. However, this requirement is often honored in the breach since the creation of additional election districts results in increased cost to the municipality and may produce an unwieldy number of County Committee members. Those County Committee members residing therein also constitute the party committee of the municipality. The legislative body of the city or town in which it is situated has the power to create, divide, consolidate or alter the boundaries of an Election District, consistent with law, Section 4–100 N.Y. Election Law.

While any enrolled member of a political party may aspire to be a district leader, in fact such persons are usually recruited by the party leadership or find their way into the work through networking. Some accept the job to advance their interest as office holders, or to support the interests and ambitions of friends. A caucus or meeting of the committee members of the entire city usually selects the endorsed candidates of the party for city council.[4] Endorsement means that a candidate's name will appear, with the rest of the city, county and state candidates to be voted for in the particular election district, on the printed official party nominating petitions and the district leaders will carry ("pack") those petitions throughout the district to collect the required number of signatures.

An insurgent candidate, on the other hand, has to create his or her own nominating petition and find supporters to carry it to obtain the necessary signatures. There are technical requirements and time deadlines for this procedure. No voter may sign more than one petition for an office. While, in theory, any enrolled member of a party can run in the primary of his or her party for election as a district leader, or, for that matter, for nomination as a city council member (and it is also possible to run for the Council as an independent candidate with no party affiliation), in actuality there are substantial practical barriers and limitations in doing so.

Where incumbents with acceptable records of performance seek renomination, it is almost automatic. Where there is no incumbent, as a matter of practice the party leadership seeks out somebody for nomination, that person is endorsed at a citywide party committee caucus and his or her petitions are printed and packed by the district leaders. This practice of slating is more significant because a local elective office is no longer as attractive as it once was in the past. Offices such as city council members do not pay as well, compared to work in the private sector, as they once did, and the benefits of the New York State Retirement System, while good, are no longer as outstanding as they once were in comparison to improved benefits in private employment. The so-called "Sunshine Law" affecting municipal board meetings, and more stringent conflict-of-interest rules than existed in the past, make such positions less attractive than formerly. The problems of local government are many, some are intractable, and the tax revenue to deal with them is limited. Young lawyers, who formerly ran for office to get public exposure and gain clients no longer need to do so.

---

**4.** Often there is an Executive Committee which pre-selects and the views of the Chair (the "City Leader") are important.

As a result of all these factors, and others, the leadership of the political parties is not swamped with qualified aspirants to elective office. Rather, where there is no incumbent from their party, leaders seek and choose the proposed nominee, sometimes with great effort, usually by networking, word of mouth and other non-public means. The choice when made is ratified by the entire city committee, and the chosen nominee's access to the ballot is then made easy—much easier than that of an insurgent or outsider, because of the procedural requirements of nomination described above, which are undertaken by the district leader. The point of all this is that with respect to New District 3, where African–Americans are only a plurality, the citywide party leadership will tend to choose African–American candidates, who will get elected if nominated by whichever party dominates in the district at the time, but such a candidate will not necessarily be the "minority preferred candidate". He or she will have been chosen in a city wide slating process, selected and nominated by white crossover votes. See *Goosby*, 180 F.3d at 491–92.

The district lines adopted here will not be revised until after the next decennial census, according to the City Charter. During the next seven to ten years the population in the City of New Rochelle and its geographical distribution will change. New political parties may develop and the historic alignments of the existing political parties may change. A reapportionment is not just for today. It must be designed to be fair to everybody, including the African American Community in New Rochelle, not just for today. For the reasons pointed out, it is not fair. Unnecessarily and unfairly, and to no good purpose, it dilutes the voting strength of the African–Americans in Old District Three from a majority to a mere plurality, and does so for no legitimate purpose.

Much is made of the fact that Ms. Beuenia Brown, the incumbent Democratic council member in Old District 3, who is a Democrat, participated in the deliberations of the Council that led to the new map and voted for it. This argument carries no weight. As an incumbent her renomination seems assured and as a member of the minority running in a plurality district in which two-thirds of the voters are at present enrolled Democratic, her immediate political future seems assured. The Court attaches no weight to the fact that she voted for the new district lines.[5]

Other criteria of *Gingles* as explained in *Goosby* all point in favor of Plaintiffs' position. *Goosby* holds that this Court need not find proof of any specific number of the factors, but a violation may not be found unless the totality of the circumstances support a conclusion that the plain meaning of the statute was violated.

Defendants cite the case of *Georgia v. Ashcroft*, 539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003), a pre-clearance case arising under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. This Court does not believe that *Ashcroft* weakens the ruling in *Gingles* and *Goosby*. The Supreme Court in *Ashcroft* held that a Section 5 claim differs from a Section 2, in that Section 2 applies to all states, while Section 5 is limited to particular covered jurisdictions. Noting that "a § 2 vote dilution claim is that a certain electoral law, practice or structure . . . causes an inequal-

---

**5.** It is highly likely that African–Americans are still a majority of the Democratic enrollment in New District 3, and could control the primary in that party. The record is not clear that this is so. If it is, it may not always be so, and that fact would not be material to our analysis.

ity in the opportunities enjoyed by black and white voters to elect their preferred representatives" *Ashcroft,* ——— U.S. at ———, 123 S.Ct. at 2510, citing *Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), with approval, *Ashcroft* also cites with approval the *dictum* in *Johnson v. De Grandy,* 512 U.S. 997, 1020, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) to the effect that:

> there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

This principle, which invites return to the days of yore, with the "balanced ticket", does not seem to apply to a Section 2 case. Under current conditions, only a minimum of "pulling hauling and trading" will be required to elect an African American council member in New District 3. Yet the pre–1993 practices of electing At Large, as noted earlier in some detail, were not successful,[6] and Section 2 forbids the deliberate restructure of a geographically compact majority minority district, to dilute the minority voting power, as was done in this case. In this case, in reapportioning the City, defendants were required to lower the population of the central district (old 3). Not content with doing this, they both took away and added people from adjoining districts. There was no need to do this and Section 2 of the Voting Act was violated thereby.

Defendants argue, and this Court agrees, that since *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), a reapportionment plan "cannot put race first" (Tr. 228) and that any effort after *Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), to create a majority minority district must be narrowly tailored to further a compelling state interest, and that racial gerrymandering is pernicious, because, among other things, it is "antithetical to our system of representative democracy" when traditional districting principles such as compactness are disregarded. However, this Court is not directing such a race conscious gerrymander; instead it is directing the restoration of the *status quo ante,* which was unnecessarily disrupted in violation of Plaintiffs rights under Section 2 of the Voting Rights Act.

### Conclusion

Plaintiffs have demonstrated that they have the right to have the central district reconfigured so as to reach a Non–Hispanic black population of at least 54.5%, within a margin of error of 1% either way, consistent with the 2000 census figures, and the City is directed to do so within sixty (60) days of the date of the Judgment to be entered in these consolidated cases. In the event of a failure to do so, this Court

---

**6.** Plaintiff Calvin Walton, a professor of political science, who has two Master's degrees in the field, and has run unsuccessfully for public office in New Rochelle, testified that the concept of a bullet vote, which this Court regards as the essence of "pulling, hauling and trading to find common ground", is "fairly well known throughout the Country but in black New Rochelle it is not utilized.

If you go back and look at the statistics over the years where there was a black candidate [running At Large for City Council], you will generally find that the black community supported the black candidate and the white running mate. You will find in other communities [of New Rochelle] however, the black candidates got fewer votes than his white running mate". (Tr. 349)

**164**

will do so, and the proposed Judgment shall contain a reservation of jurisdiction to enforce its provisions. In performing this reconfiguration, the present citywide average population per council district shall be adhered to as closely as possible. Obviously, a portion or portions of Old District 3 must be transferred to one or more adjoining districts, to achieve this parity, but there should be no need to add to the New District 3 areas which were not part of Old District 3. Areas which were formerly in Old District 3 should be part of the reconfigured district to the extent feasible, and defined neighborhoods and projects should not be divided except where unavoidable. The City Council may exercise its discretion in drawing new lines necessary to place Plaintiffs in the same relative position as they were before redistricting. The Court declines to impose the so-called Beveridge Plan, requested by Plaintiffs.

The Court concludes that Plaintiffs in both actions are prevailing parties. Their Counsel may apply for a fee award to be included in the Judgment by affidavit setting forth their lodestar, and are invited, alternatively, to agree on a reasonable fee award with the City.

The foregoing constitutes this Court's findings of fact and conclusions of law after trial.

Settle a proposed judgment on ten (10) days notice, or waiver of notice, consistent with the foregoing.

SO ORDERED.